In the Matter of ERNEST G. PELTZ, an Attorney, Respondent. J. FRANK TRAYNOR, Petitioner.

Fourth Department, May 13, 1965.

*J. Frank Traynor,* petitioner in person.

*George J. Skivington* and *Ernest G. Peltz,* respondent in person, for respondent.

*Per Curiam.* Respondent was admitted to practice law in this State in March, 1952, and is charged with professional misconduct. Upon receipt of complaints this matter was sent to Steuben County Bar Association for investigation. Following the taking of testimony by its Grievance Committee, which was reported to this court, we appointed an attorney to conduct a preliminary investigation. At the hearings which consumed several days the testimony of various witnesses was taken, including a lengthy examination of respondent. The preliminary investigation resulted in 729 pages of testimony, 584 exhibits and covered the period from June 1, 1962 to January 1, 1964.

The principal inquiry was concerned with funds in an estate of one Stella Schneider which were the proceeds of certain United States Government bonds, payable to the decedent and on her death to one Anna Zyla, decedent's sister. The bonds were surrendered by Rochester relatives of the decedent and the proceeds in the form of a United States Treasurer's check in the amount of $3,184.19 were delivered to a Rochester attorney. The Rochester relatives had paid $1,011.16 for the funeral expenses of the decedent and had incurred an additional obligation for attorney's services and disbursements of $36.25. The Rochester attorney sent the United States Treasurer's check to the respondent with a covering letter of November 21, 1962 which read as follows:

"Enclosed is a check payable to Mrs. Anna Zyla in the amount of $3,184.19, which I am sending to you with the understanding that you are going to send me either her check or your check made payable to me, as attorney, in the amount of $1,011.16 to cover the funeral bills of Stella Schneider, and also an additional payment to me in the amount of $36.25 for fees and disbursements due me, making a total payment to me of $1,047.41.

"If there are any questions about this, please call me."

The letter and check were received by respondent on November 23, 1962, indorsed by Anna Zyla and deposited in respondent's trust account, sometimes referred to in the record as escrow account. On the following day respondent delivered a check drawn on the trust account to Anna Zyla in the amount of $1,911.78 and retained in his trust account $1,047.41, the amount which was to be sent to the Rochester attorney under the terms of the covering letter. Respondent retained $225 as a fee for his services. For a period of about three months the Rochester attorney wrote respondent on several occasions, without reply, and attempted to reach him by telephone to urge him to forward the $1,047.41. At various times respondent made promises to pay the due amount to the Rochester attorney but no payment was in fact made. A summons was served on Anna Zyla and a suit brought against her by the Rochester attorney in June of 1963. Respondent appeared for said Zyla and no payments were made, although the Rochester attorney testified that various promises of payment were made to him. On September 9, 1963 the Rochester attorney wrote to the president of the Steuben County Bar Association asking that an inquiry be had in the matter. On December 31, 1963 respondent wrote his client Zyla that he was discontinuing his practice as of January 1, 1964 to enter upon his duties as Surrogate and that he was turning over to an office associate the $1,047.41. On March 20, 1964 respondent's office associate forwarded a check for $1,047.41 to the Rochester attorney. In connection with the Zyla account, respondent admitted in his answer that a statement he made to the Grievance Committee on June 11, 1964 '' that there had been no intermingling of funds, and that the escrow money in the Anna Zyla matter had always been in the Escrow Account of Respondent, was untrue and was known by the Respondent at the time that he made the statement to be untrue ''.

In the preliminary investigation uncontradicted evidence, which respondent has admitted is accurate, was introduced showing the actual balances in respondent's trust account, the required balances and the deficiencies in the trust account. Starting with June 15, 1962 and ending with December 31, 1963 there were 116 entries showing that on 104 dates there were deficiencies in the trust account, as a result of personal use by respondent of money owed to clients. For the period under examination the trust account was generally deficient in sums starting with $55.86 and running as high as $4,538.77. The average deficiency for the 104 dates was $1,380.26 and on nine occasions it was actually overdrawn.

The trust account was used indiscriminately for every class of deposit and every class of expenditure. Furthermore, money was transferred from that account to respondent's personal account and back again to serve personal needs without regard to obligations to clients. Trust funds owing to clients were retained for substantial periods of time for respondent's personal use and not paid to clients promptly. Such personal obligations as 18 checks in payment of insurance premiums, 4 checks in payment of income taxes, 43 checks in payment of interest and principal payments on promissory notes and mortgages, 19 checks in payment of household bills, 80 checks in payment of office expenses and payroll, 31 checks payable to cash, and 68 checks of $50 each to respondent's mother were all made from the trust account. The absence of account books, other than check stubs, for a substantial period and particularly the last six months of 1963, greatly impeded and extended the investigation (cf. *Matter of Phillies*, 17 A D 2d 93, 100, 101). In addition, there were many alterations and changes on the check stubs between the period of the Grievance Committee hearings and the preliminary investigation. When respondent closed his law office on December 31, 1963, there remained a deficiency of $3,534.84 in his trust account.

After receipt and examination of the testimony in the preliminary investigation we directed the attorney who made the investigation to prepare, serve and file such petition for disciplinary action as the facts warrant. After service of the petition respondent appeared by an attorney and filed a verified answer. Respondent in appearance before this court, with his attorney, orally admitted, as he did in his verified answer, that the above computations were correct and that " I don't deny that I co-mingled funds. I don't deny any of the factual matter as I have said.'' He stated to the court that no one had been hurt by his actions to date and that he hoped to sell his home and make further restitution. Both respondent and his attorney stated that no further hearing was necessary, requested that none be had and that the matter be determined on the papers before the court.

During the period in question respondent borrowed money from several private persons, including a $3,500 cash loan from a Steuben County attorney two days before he assumed office as Surrogate, and from various banks and deposited these sums in his trust account. It is of interest that if the borrowed money was not given to him in cash, respondent cashed the checks and always deposited this money in cash in his trust account. His

only explanation for this unusual procedure was that he "liked to see the money".

On at least four occasions respondent borrowed sums from three banks ranging from $1,000 to $16,000. Each time borrowings were made he furnished a signed statement to the bank certifying that the schedules were true and correct. Each of the statements was, in fact, false for there were omissions such as failure to note a second mortgage on his home, failure to report unsecured notes to others and other discrepancies. The statements were also false in that they understated respondent's liabilities; an example being a statement to the Lincoln Rochester Trust Company in which he indicated that he owed $9,150 on notes and loans, when in fact, as admitted by respondent, he owed in excess of $26,000.

The Canons of Professional Ethics of the American Bar Association to which every attorney unconditionally subscribes upon his admission to the Bar, specifically require that: " Money of the client or collected for the client or other trust property coming into the possession of the lawyer should be reported and accounted for promptly, and should not under any circumstances be commingled with his own or be used by him."

The decisions in this State are legion that " Common honesty demands a strict compliance with this requirement. An attorney holds as trustee any money which he collects for his client, and is under a strict obligation to keep it separate from his own, and to pay it over without delay. If he fails so to do, and uses it for any purpose of his own, he violates his duty, and should be disciplined. (*Matter of Menzel,* 216 App. Div. 176, 179; *Matter of Dobbs,* 173 *id.* 605; *Matter of Maged,* 163 *id.* 880; *Matter of Cohn,* 141 *id.* 511.) This rule has been stated and emphasized so many times that repetition ought to be unnecessary, and excuses for its violation should be ignored." (*Matter of Babcock,* 230 App. Div. 323, 325.) This court has repeatedly asserted this principle in language so clear and unequivocal that there can be no avoidance of disciplinary action when an attorney violates this solemn duty (*Matter of Ropiecki,* 246 App. Div. 80; *Matter of Powers,* 235 App. Div. 382).

The failure of respondent to comply strictly with the terms set forth in the letter from the Rochester attorney was a breach of his professional obligations. If for any reason he could not carry out the terms of the covering letter, respondent was under the duty to return the check. His refusal to answer the several letters of the attorney and his breach of the many promises to send the money were, without question, professionally improper.

Respondent's admission that he testified falsely before the Grievance Committee, the alterations in his check books between the dates of the Grievance Committee hearings and the preliminary investigation, the evasiveness of his testimony in all of the hearings and his submission of false certified statements to banks further demonstrate respondent's unfitness to continue as an attorney. Judge CARDOZO wrote that "Membership in the bar is a privilege burdened with conditions. A fair private and professional character is one of them." (*Matter of Rouss*, 221 N. Y. 81, 84). Respondent has broken these conditions and must therefore suffer the loss of the privilege to practice. Honor and fair dealing must always be the invariable rule of our profession and must be upheld. Respondent should be disbarred.

WILLIAMS, P. J., BASTOW, GOLDMAN, HENRY and NOONAN, JJ., concur.

Order of disbarment entered.