567 F.2d 225
 Fed. Sec. L. Rep. P 96,237
The FUND OF FUNDS, LIMITED, FOF Proprietary Funds, Ltd., and
IOS Growth Fund, Limited, a/k/a Transglobal Growth
Fund, Limited, Plaintiffs-Appellees,
v.
ARTHUR ANDERSEN & CO., Arthur Andersen & Co. (Switzerland),
and Arthur Andersen & Co., S.A., Defendants-Appellants.
 No. 311, Docket 77-7387.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 11, 1977.
Decided Nov. 7, 1977.
 
 Edward J. Ross, New York City (James D. Zirin, Breed, Abbott & Morgan, New York City, Charles W. Boand, Wilson & McIlvaine, Chicago, Ill., of counsel), for defendants-appellants.
 Robert A. Meister, New York City (George L. Graff, Robert Thomajan and Milgrim, Thomajan & Jacobs, New York City, of counsel), for plaintiffs-appellees.
 Before KAUFMAN, Chief Judge, and SMITH and OAKES, Circuit Judges.
 IRVING R. KAUFMAN, Chief Judge:
 
 
 1
 The unusual facts of this case, which we shall present with painstaking care, impel us to the irresistible conclusion that counsel for the plaintiffs have failed in their duty to comply with both the letter and spirit of Canons 4, 5 and 9 of the Code of Professional Responsibility and must be disqualified. We hasten to add that the lawyers involved in this dispute are individuals who enjoy the high regard of the profession. Compliance or noncompliance with Canons of Ethics frequently do not involve morality or venality, but differences of opinions among honest men over the ethical propriety of conduct.
 
 
 2
 Arthur Andersen & Co., an international accounting concern, charges that, in 1973, its regional counsel, Morgan Lewis & Bockius, a firm of repute, accepted a retainer from Fund of Funds[1] with the knowledge that Andersen might be implicated in securities actions brought on behalf of the Fund, and that such representation constituted a breach of the Morgan firm's duty of undivided loyalty to its client, Andersen. Andersen now asserts that Robert Meister, an able member of the bar and partner in the firm of Milgrim Thomajan & Jacobs, also a respected firm of lawyers, had served throughout as the Morgan firm's "understudy," and emerged from the wings in February, 1975, when the action against Andersen was commenced. It is claimed Meister and his firm Milgrim Thomajan aided and abetted Morgan Lewis & Bockius's breach of fiduciary duty and thereby violated Canons 4, 5 and 9 of the Code of Professional Responsibility.[2] We agree, and believe that in light of the interesting background of this case, Meister or his firm cannot continue to prosecute the underlying action. Accordingly, we reverse that part of Judge Stewart's holding which permits Meister to proceed on behalf of the Fund. We affirm, however, Judge Stewart's denial of the ancillary relief requested by Andersen.[3]
 
 I.
 
 3
 It is a longstanding rule that,
 
 
 4
 When dealing with ethical principles, . . . we cannot paint with broad strokes. The lines are fine and must be so marked. Guideposts can be established when virgin ground is being explored, and the conclusion in a particular case can be reached only after painstaking analysis of the facts and precise application of precedent.[4]
 
 
 5
 We approach our task in this factually complex case conscious of this oft-repeated admonition and with the recognition that in deciding questions of professional ethics men of good will often differ in their conclusions.
 
 
 6
 At the outset, it is necessary to describe the two actions which are at the heart of this case: Fund of Funds v. King and Fund of Funds v. Arthur Andersen & Co. Both actions assert violations of the federal securities laws and arise out of a common series of transactions involving the purchase, valuation and revaluation of certain natural resource assets. The King complaint, filed by Meister for Milgrim Thomajan on May 8, 1974, with the Morgan firm designated "of counsel," alleged that Edward Cowett (a director of Investors Overseas Ltd.) conspired with John King and A. Rowland Boucher (who jointly controlled King Resources Inc.)[5] to have King Resources sell natural resource assets to the Fund at highly inflated prices.[6] Those assets were thereafter revalued to an even higher figure so that Investors Overseas Ltd. (IOS Ltd.), the Fund's management advisor, could be paid a performance fee equal to 10% Of such upward revaluation.[7] This alleged conspiracy was effected through the creation of a Natural Resources Fund Account to pay for the assets on behalf of the Fund. The Bank of New York, the account's manager, was also named as a defendant in the King action. Finally, the attorneys for Fund of Funds, the venerable law firm of Willkie Farr & Gallagher, were sued for their failure to advise the Fund's directors of the alleged wrongdoing.
 
 
 7
 The Andersen complaint, filed by Meister for Milgrim Thomajan on February 4, 1975, claimed that Andersen, as the independent auditor for Fund of Funds, IOS Ltd., and King Resources was aware of this fraudulent scheme and neglected to disclose it to the Fund's directors. Moreover, the complaint stated that Andersen actively participated in the wrongdoing by certifying the Fund's financial statements.
 
 A.
 
 8
 The tortuous history leading to the institution of these actions began in the winter of 1973 when a group of German investors formed an organization called the International Association of Shareholders of IOS Funds, referred to by the acronym "IASIF." On January 8, 1973, IASIF retained Morgan Lewis & Bockius as its counsel, empowering it to bring lawsuits in the United States regarding the fraudulent transactions in natural resource assets. No action was taken, however, until June 28 or 29, 1973, when Park Dilks, Jr., a partner of the Morgan firm, met with other representatives of Fund of Funds shareholders in Luxembourg. It was there determined that Fund of Funds would be liquidated under Ontario law[8] and that the liquidator, appointed by the Supreme Court of Ontario, would sue the persons and firms allegedly responsible for FOF's losses. John Orr, a partner in the accounting firm of Touche, Ross Ltd., was appointed as liquidator and he, in turn, named Borden & Elliot as his general solicitors. Andersen stresses that the Morgan firm conceived and executed these appointments to ensure that it would be named counsel for the liquidator in the United States, and there is testimony in the record which would support Andersen's claim.[9] Indeed, Morgan Lewis was retained as American counsel soon after Borden's appointment. In accepting the retainers from IASIF and John Orr (through Borden & Elliot), certain members of Morgan Lewis were aware that the firm's client of 15 years, Arthur Andersen & Co., might well be implicated in the natural resources scheme. Indeed, on July 22, 1974, Park Dilks, Jr. (the partner at Morgan Lewis in charge of FOF matters) wrote to Rino Stradiotto (a partner at Borden & Elliot), and commented on the choice of liquidator:
 
 
 9
 On July 20, 1973, you . . . and I, while having dinner at the Union League, discussed who should be liquidator and considered various accounting firms as alternatives. . . . We ticked off Price Waterhouse, Peat Marwick, Ernst & Ernst, Coopers & Lybrand, and AA (Arthur Andersen). When we got to AA we remarked that, even though we were regional counsel for them and might otherwise want to favor them, they had been auditors for FOF . . . and would probably end up being sued.
 
 
 10
 In a partial response to this nascent ethical dilemma, Morgan Lewis, whose representation of Andersen involved a variety of matters unrelated to Fund of Funds, made it a policy of the firm that no attorneys involved with Andersen matters would work on the Fund of Funds case.[10]
 
 
 11
 For the next nine months, a squadron of Morgan Lewis attorneys investigated the allegedly fraudulent transactions. John Lewis, a partner with the Morgan firm, noted, in an affidavit submitted in King, that his firm was instructed to "analyze, examine and review all substantial transactions affecting the interests of the plaintiff funds and their shareholders" and that the investigation undertaken pursuant to that directive "required several hundred hours of time and involved the examination of thousands of documents." This extensive inquiry ultimately led to the institution of approximately twenty actions, including King, on behalf of the Liquidator in the United States.
 
 
 12
 From the investigation's inception, Morgan Lewis tried to avoid "making a case" against Andersen, and Morgan attorneys repeatedly informed their counterparts at Borden & Elliot that they would not participate in any way in the consideration of Andersen's possible wrongdoing. Indeed, Park Dilks, Jr. made his firm's position clear throughout the summer of 1974 to the evident distress of George Cihra, an attorney at Borden & Elliot. Cihra felt that the Morgan lawyers had not been altogether forthright in failing to clearly spell out their existing and continuing involvement with Andersen. Amidst this ill-feeling, consideration of a suit against Andersen was held in abeyance.
 
 
 13
 During this very period, when Morgan Lewis was loudly protesting its desire to be 'cleaner than a hound's tooth' with regard to Arthur Andersen, the firm did not shut its eyes altogether to their client's possible liability. As the group of Morgan Lewis attorneys pored through documents, they put aside anything that was 'really hot' as to Andersen and sent it to Borden & Elliot. And on several occasions, correspondence between the two firms suggests that Morgan Lewis had inquired as to the "status of the (Andersen) matter."
 
 
 14
 For some time, Morgan Lewis had maintained a close working relationship with Robert Meister and his firm, Milgrim Thomajan and Jacobs. As Morgan Lewis's investigation in what was to be the action FOF v. King began to take shape, John Lewis, a partner in the Morgan firm, asked Meister whether he would assist in the contemplated litigation. Meister was the logical choice for local counsel. He and his firm had been co-counsel with Morgan Lewis for the Ontario liquidator in another suit in the Southern District of New York, SEC v. Vesco. Meister consented to this new association with the Morgan firm and spent over a month inspecting documents and reviewing a draft of the King complaint. With Meister and Milgrim Thomajan the counsel of record, the King complaint was filed on May 8, 1974.
 
 
 15
 The lurking ethical problems which originally led Morgan Lewis to create a "Chinese Wall" between the attorneys representing Andersen and those representing FOF came of age after the King action was filed. At a meeting held in Toronto on May 23 and 24, 1974, representatives of Borden & Elliot and Morgan Lewis met with Martin Mensch, counsel to Global Industries. Mensch asserted that his client had a right to recover for the claims relating to natural resource assets. But Mensch, characterized as an "outsider" by Park Dilks, Jr. troubled Morgan Lewis by his choice of litigation strategy. He intended, he advised, to bring suit against Andersen and all the defendants named in the King action and to seek consolidation of his prospective action with King. At the Toronto meeting, Mensch elaborated on his plan and expressed concern that, without consolidation, Andersen might argue that the action was impermissibly split and escape liability altogether. During these discussions, Morgan attorneys avoided any comment on Andersen's potential liability. Indeed, Park Dilks, Jr. described the departure of Morgan Lewis attorneys during discussions of Andersen as their customary "disappearing act." Morgan Lewis, however, could not "disappear" so easily. Borden & Elliot was understandably disturbed by the needless expense and effort involved in bringing multiple suits and by Mensch's legal opinion that FOF might forfeit its claim against Andersen. To assuage Borden & Elliot's fears, Morgan attorneys opined that the "split action" defense was not available, a view which they confirmed in a subsequent letter.
 
 
 16
 Morgan Lewis's dismay at Mensch's intercession did not surprise anyone at the Toronto meeting, for if Mensch carried through his contemplated action, Morgan Lewis would find itself in the untenable position of opposing Andersen in the same courtroom. Consequently, Morgan Lewis struggled with alternative solutions to avoid this unseemly result. It first hoped to get Andersen's consent to its continued representation of Fund of Funds, but that was refused. It then suggested to Meister that he carry on as sole counsel in King should the action be consolidated with Mensch's planned suit. Park Dilks, Jr., writing to Borden & Elliot, noted that Morgan Lewis would have "so equipped" Meister that he could carry on the King litigation. This plan, too, was discarded since Morgan Lewis sought to avoid consolidation and the incident legal battles concerning the ownership of the FOF claims. Morgan subsequently developed a cross-ratification arrangement with Mensch, whereby Mensch would continue to prosecute his claim separately, and Global and Fund of Funds would share in any recovery. This plan, of course, appealed to Morgan Lewis since it removed any need for its potential withdrawal from King. To expedite the plan, Dilks suggested to Borden & Elliot that Meister be enlisted to aid Mensch in drafting the Global complaint. When offered Meister's services, however, Mensch refused despite the fact that he appeared to be making no progress on the complaint. The delay disturbed the Morgan firm, which hoped to get the Andersen difficulties behind it.[11]
 
 
 17
 Because of Mensch's recalcitrance, the cross-ratification plan was discarded in late January 1975, when Morgan and Borden attorneys met with Mensch at the offices of Morgan Lewis. It was then arranged for Fund of Funds, rather than Global, to sue Andersen; for Mensch to concede that the natural resource assets claims did not belong solely to Global; and for Fund of Funds and Global to share in any recovery produced by both actions. Park Dilks, Jr. succinctly expressed the ultimate result of that meeting: there would be a division of the pot. Morgan attorneys pressed this alternative since Meister, with whom they had a longstanding relationship, would be counsel for Fund of Funds. The agreement reached on the 22nd of January was embodied in a draft prepared at Morgan Lewis, with Meister and Mensch delegated the task of negotiating language changes, and the accord was finally signed on February 23, 1975.
 
 
 18
 While the difficulties with Mensch were worked out, John Orr, at the urging of Park Dilks, Jr. kept the question of a separate suit against Andersen in abeyance. Indeed, John Orr and George Cihra of Borden & Elliot, had made only limited inquiries in September and October 1974 as to whether the available evidence supported a suit against Andersen. They did so partly at the urging of Meister who, erroneously, had counselled Cihra that the statute of limitations might run against Andersen. In fact, Dilks had already pointed out to Borden & Elliot, by letter dated August 14, 1974, that there was no difficulty in this regard.
 
 
 19
 Plans for the actual suit against Andersen began in earnest the day after the meeting of Morgan and Borden attorneys with Mensch when, on January 23, 1975, Meister and his firm were specifically retained by Borden & Elliot to prepare for an action to be filed in the Southern District of New York.
 
 
 20
 The circumstances leading to the choice of Meister are a matter of vigorous dispute. Fund of Funds claims that it was exercising independent judgment in selecting Meister and his law firm, Milgrim Thomajan, while Andersen claims that Meister was urged upon the liquidator by Morgan Lewis. Whether or not the referral was explicit, it is certainly beyond any doubt that Meister had been brought to the attention of the liquidator through his association with the Morgan firm. At the urging of Morgan Lewis, Meister had been retained to represent the Fund in SEC v. Vesco ; Meister, of course, was co-counsel in the King action; and, when Morgan Lewis considered stepping down as counsel in King as a result of the problems with Mensch, Morgan Lewis made it known that Meister, and presumably Meister alone, was fully equipped to carry on.
 
 
 21
 Meister began his review of the documents relating to Andersen, including those supplied by Morgan Lewis, on January 23, 1977, and five days later, flew to Toronto to meet with Orr and the attorneys from Borden & Elliot. At the end of the day-long discussion, Orr formally agreed that an action would be commenced against Andersen on behalf of Fund of Funds, and Meister thereupon drafted a short opinion letter which he telecopied from New York to Borden & Elliot the next day.
 
 
 22
 When Meister returned to New York on January 30, drafting of the actual Andersen complaint began. In framing the complaint over the next five days, Meister and his associates liberally used relevant portions of the complaint in Fund of Funds v. King, and the two complaints are similar in substantial respects.
 
 
 23
 On February 3, 1975, the day before Andersen was filed, Joseph Goldstein, an associate with Morgan Lewis, came to New York to review Meister's work and spent six and a half hours in the Milgrim firm's offices. While Goldstein testified that he made no substantive suggestions and that the sole purpose of his trip was to ensure that the King complaint was copied correctly, the time sheet of one of Meister's legal assistants suggests Goldstein's greater involvement:Review and revision of complaint with RAMe (Meister), GG (Graf, an associate in the Milgrim firm), Joe Goldstein.
 
 
 24
 Two incidents occurring after the Andersen complaint was filed conclude Morgan Lewis's association with that action. First, Joseph Goldstein met with Meister in Houston to retain Keplinger Associates, a firm expert in the valuation of natural resource assets. Keplinger's fee was to be paid jointly by the two firms, and a "statement of tasks" ultimately sent to Keplinger involved both actions. Second, Meister and Goldstein interviewed former Governor Wyatt, who had been a director of Fund of Funds, in the offices of Milgrim Thomajan. While the interviews were conducted independently, Wyatt was asked questions relating to both actions. Moreover, Goldstein remained in the room during Meister's interview with the former Governor.
 
 
 25
 After the filing of Meister's complaint, Andersen, not surprisingly, retained counsel other than Morgan Lewis to represent it in all its actions within the Philadelphia area and, in May 1977, Andersen requested that the Morgan firm withdraw from all pending actions. The attorney disqualification motion in the instant case was filed shortly afterwards.
 
 B.
 
 26
 Judge Stewart, after taking extensive testimony, found that Morgan Lewis had participated in the filing of a suit against Andersen by (1) sorting out documents relating to Andersen; (2) inquiring of Borden & Elliot with regard to the status of the Andersen investigation; (3) giving legal opinions concerning possible Andersen defenses; (4) choosing Meister to sue Andersen; (5) attending meetings in which the suit against Andersen was discussed; (6) reviewing the Andersen complaint; and (7) coordinating the interviews with Keplinger Associates and Wyatt. Judge Stewart held that these activities were undertaken contrary to the interests of an existing client and that Morgan Lewis would have been disqualified from bringing the underlying action against Andersen for breach of its duty of undivided loyalty under Canon 5 of the Code of Professional Responsibility.
 
 
 27
 Judge Stewart then turned to see if Meister and his firm had actually or possibly received confidences from Morgan attorneys regarding Andersen. He analyzed four facets of the relationship between Morgan Lewis and Meister: Morgan Lewis's instrumental role in having Meister selected as the Fund's attorney; Goldstein's review of the complaint in the Andersen case; and the two contacts between Meister and Goldstein subsequent to the filing of the complaint. Finding Morgan Lewis's involvement troublesome, Judge Stewart nonetheless concluded that it was highly unlikely that any confidential information could have been disclosed. He refused to disqualify Meister and his law firm, Milgrim Thomajan, and declined also to dismiss the complaint with prejudice or to suppress certain evidence as tainted. He did, however, suggest that Milgrim Thomajan's continued presence as counsel of record in the King suit created an appearance of impropriety and that it should withdraw, which it promptly did.
 
 
 28
 This appeal followed.
 
 II.
 
 29
 We are of the view that Judge Stewart abused his discretion by failing properly to consider the provisions of Canon 5 and, in analyzing Meister's Canon 4 responsibility, by focusing too narrowly on four incidents in which Meister had dealings with members of the Morgan firm. We believe, too, that the district court glossed over the teaching of Canon 9 that even an appearance of impropriety requires prompt remedial action.
 
 
 30
 In framing our consideration of Meister's behavior, we must address first the ethical responsibilities of Morgan Lewis & Bockius. It is clear that Judge Stewart properly held that Morgan Lewis would have been disqualified had it sued or attempted to sue Andersen. As a current and actual client at the time Morgan Lewis accepted the retainer from Fund of Funds, Andersen had an absolute right to the firm's undivided loyalty. Cinema 5 Ltd. v. Cinerama, Inc., 528 F.2d 1384, 1386 (2d Cir. 1976). However strenuously Morgan Lewis labored to avoid any prejudice to the interests of Andersen and the record does indicate Morgan Lewis's repeated efforts to escape sinking into the ethical quagmires its representation of the Fund invited it was a goal impossible to achieve. At every turn, lawyers in Morgan Lewis were presented with documents which touched on Andersen's potential liability in the natural resource scheme. Judge Stewart's delineation of the many ways in which Morgan Lewis participated in the investigation and filing of a suit against Andersen the recital of which, in our view, does not exhaustively define the evidence of their involvement amply demonstrates the wisdom of the admonition in Cinema 5 that "no man can serve two masters." Id. at 1386.[12]
 
 
 31
 Against this background, Andersen's motion to disqualify Meister and his law firm, Milgrim Thomajan & Jacobs, can be seen to stand on two distinct grounds: that Meister aided and abetted Morgan Lewis's breach of its duty of undivided loyalty to Andersen under Canon 5,[13] and that, under Canon 4,[14] Meister was so intimately related to the Morgan firm that confidences disclosed by Andersen to Morgan Lewis could have been revealed. These two claims must be set in the context of the broad admonition of Canon 9 that an attorney must avoid even the appearance of impropriety.[15]
 
 A.
 
 32
 The issue under Canon 5, simply put, is whether, by permitting Meister to pursue the underlying action, we would be allowing Morgan Lewis to violate by indirection those very strictures it cannot directly contravene. Since Morgan Lewis's duty to Andersen was tantamount to that of a fiduciary or trustee, see Hafter v. Farkas, 498 F.2d 587, 589 (2d Cir. 1974) Meister's action must be evaluated in light of the well-established body of law regulating fiduciary relationships.[16]
 
 
 33
 The principle that a lawyer cannot delegate his fiduciary duties to another in an effort to avoid its strictures or to avoid responsibility for the manner in which they are undertaken is settled law. See A Wise, Legal Ethics 256 (2 ed. 1970). A case arising in the Ninth Circuit provides an apt illustration of this tenet. Norman v. McKee, 431 F.2d 769 (1970). There, one of the appellees had been general counsel for the corporate appellant and, in that capacity, had represented the corporation in a variety of matters related to the litigation at hand. The Court decided that neither he nor his counsel could appear against the corporation. It noted: "to allow him to appear through his attorney would be to allow him to do indirectly what he cannot do directly." Id. at 772.
 
 
 34
 This maxim was again emphasized by us in Hull v. Celanese Corp., 513 F.2d 568, 571 (2d Cir. 1973). We affirmed the disqualification of an unrelated law firm after the district court found that the lawyer-client, who had been general counsel for the adversary, might have "consciously or unconsciously" transmitted some confidence to the previously untainted firm. Hull v. Celanese, supra, at 570. While we explicitly placed reliance on Canons 4 and 9 of the Code, the import of our decision was to safeguard against the indirect breach of "the lawyer's duty of absolute fidelity . . .." Ceramco, Inc. v. Lee Pharmaceuticals, 510 F.2d 268, 271 (2d Cir. 1975).[17]
 
 
 35
 These cases are illuminating in their teaching and the principle they announce applies with singular potency here. The truism that the firm of Morgan Lewis would have been disqualified from suing Andersen because it was Andersen's counsel, is of little comfort to Andersen which now finds itself embroiled in litigation resulting from Morgan Lewis's extensive investigation of the natural resource assets scheme. And Robert Meister is the extension of Morgan Lewis's continuing involvement in the underlying action for, as we have earlier stated, Morgan Lewis was instrumental in the choice of Meister and his firm, Milgrim Thomajan, to bring the suit and helpful to Meister in advancing the suit even if, as claimed by Meister, that help was of small significance. Moreover, Meister accepted the retainer from Orr to sue Andersen knowing of the Morgan firm's ethical dilemma.[18] Indeed, his retention as counsel was premised on and resulted from the Morgan firm's incapacity to pursue the claim itself. Armed with that knowledge, and aided in some degree by Morgan Lewis, Meister should not have accepted the retainer.
 
 
 36
 The determination that Meister should be disqualified under Canon 5 is further underpinned by the restraints imposed by Canon 9. We see this in applying the principle clearly set forth in Cinema 5 v. Cinerama Ltd., supra at 1389. There a lawyer, who was a partner in both a Buffalo and New York law firm, sought, in his capacity as a partner in the Buffalo firm, to represent a client with interests in litigation adverse to that of a client of the New York firm. We expressly invoked Canon 9, holding that the duty of undivided loyalty extended, through the medium of the single partner, from the New York to the Buffalo firm. While Cinema 5 relied on the nexus of partnership, we have also held that disqualification extends to individuals associated with a firm in a lesser capacity, for example, a law clerk. Consolidated Theatres v. Warner Bros. Cir. Man. Corp., 216 F.2d 920, 927 (2d Cir. 1954). And we have never believed that labels alone partner, clerk, co-counsel should control our decisions in so sensitive an area.[19] Here, where Meister worked closely with Morgan Lewis not only in King (a related case)[20] but in SEC v. Vesco, an appearance of impropriety arises from this close association. Further, given the extraordinary, sui generis facts underlying this action, the generally stated rule that a 'co-counsel' relationship will not alone warrant disqualification is of little relevance to this case. See Consolidated Theatres, Inc. v. Warner Bros. Cir. Man. Corp., supra; Akerly v. Red Barn System, Inc., 551 F.2d 539 (3d Cir. 1977); American Can Co. v. Citrus Feed Co., 436 F.2d 1125 (5th Cir. 1971).
 
 B.
 
 37
 The impropriety of Meister's continued representation of the Fund appears with even greater clarity in the context of Canon 4's admonition that an attorney must not disclose the confidences of his client. That Canon has been applied in a long series of cases within this Circuit, starting with a landmark district court opinion in T. C. Theatre Corp. v. Warner Bros. Pictures, 113 F.Supp. 265 (S.D.N.Y.1953). Confronted with a case where a lawyer was seeking to represent a client whose interests were adverse to those of a former client, Judge Weinfeld instructed that:
 
 
 38
 the former client (must) show no more than that the matters embraced within the pending suit wherein his former attorney appears . . . are substantially related to the matters or cause of action where the attorney previously represented him, the former client. The Court will assume that during the course of the former representation confidences were disclosed . . .. Only in this manner can the lawyer's duty of absolute fidelity be enforced and the spirit of the rule . . . be maintained. T. C. Theatre Corp. v. Warner Bros. Pictures, supra, at 268-9.
 
 
 39
 The so-called 'substantially related' test in T. C. Theatre has been given form over the years, both in the exclusive context of private practice, see, e. g., Emle Industries, Inc. v. Patentex, Inc., 478 F.2d 562 (2d Cir. 1973); Hull v. Celanese Corp., supra; NCK v. Bregman Ltd., 542 F.2d 128 (2d Cir. 1976), and in cases involving government attorneys who have returned to the private sector. See, e. g. United States v. Standard Oil Co., 136 F.Supp. 345 (S.D.N.Y.1955); General Motors Corp. v. City of New York, 501 F.2d 639 (2d Cir. 1974). See generally, Note, The Second Circuit and Attorney Disqualification Silver Chrysler Steers in a New Direction, 44 Fordham L.Rev. 130 (1975).
 
 
 40
 In triangular relationships, such as the one before us, the "substantial relationship" test requires that we ask ourselves whether Meister, through his relationship with Morgan Lewis, was in a position to receive relevant confidences regarding Andersen. Our decisions in Hull and NCK mandate an affirmative answer to that question. Hull, whose facts have been described, required the disqualification of a previously neutral law firm merely on a showing that the tainted lawyer client might have transmitted some confidences to the firm. And NCK v. Bregman, Ltd., supra, presents an analogically compelling triangle of conflict. There, the issue was whether a law firm could represent a corporate officer against his former corporate employer where both the firm and the client had consulted with corporate house counsel on subjects at issue in the suit. We held without reservation in NCK that the firm's disqualification was required even in the absence of a showing that confidences had actually been disclosed, or that there was a potential for future disclosure. The presumption of potentially improper disclosure was considered sufficient. NCK v. Bregman, Ltd., supra, at 134.
 
 
 41
 The case before us, of two firms working closely to represent a common client, calls for the same conclusion. In undertaking the background investigation, and in segregating the papers which were, in part, ultimately used against Andersen, Morgan Lewis was applying its privileged knowledge with respect to Andersen. For, as Judge Stewart found, Morgan Lewis was privy to Andersen's practices and procedures, and had access to internal papers. It is inevitable that Meister, who dealt closely with Morgan Lewis throughout this entire period, was afforded the opportunity to benefit from this privileged information with regard to Andersen.[21]
 
 
 42
 It is in this context that we find most troublesome Judge Stewart's decision to consider only four of the contacts between the Morgan and Milgrim firms, and to ignore the extensive and intimate contacts between the firms dating back, at the least, to the summer of 1973. The history of their mutual representation has been amply set out above, and does not bear repetition. We pause only to note that the adage, "the whole is greater than the sum of its parts" applies with singular force when considering the character of the Milgrim-Morgan relationship.
 
 
 43
 In resolving the dispute under Canon 4 in favor of disqualification, we do so mindful of the admonition of Emle :
 
 
 44
 Even the most rigorous self-discipline might not prevent a lawyer from unconsciously using or manipulating a confidence acquired in the earlier representation and transforming it to telling advantage in the subsequent litigation. . . . The dynamics of litigation are far too subtle, the attorney's role in that process is far too critical, and the public's interest in the outcome is far too great to leave room for even the slightest doubt concerning the ethical propriety of a lawyer's representation in a given case. Emle Industries, Inc. v. Patentex, Inc., supra, at 571.
 
 III.
 
 45
 Beyond the disqualification of Meister and his firm, Andersen sought dismissal of the complaint with prejudice and suppression of any facts, documents, or information obtained by Morgan Lewis or by Milgrim Thomajan. We do not believe that either of these severe remedies is warranted under the circumstances.
 
 
 46
 In W. T. Grant v. Haines, 531 F.2d 671 (2d Cir. 1976), we expressly disapproved both the dismissal of the complaint and the suppression of evidence despite a finding that the attorney's conduct was "inappropriate." We noted:
 
 
 47
 We can find no precedent for dismissal of the complaint; and the mere fact that Grant retained the Liebman firm and that house counsel was present at the time of the (improper) interrogation, cannot reasonably justify that penalty here. The sins of counsel should not be visited upon his client so as to vitiate the latter's cause of action. Id. at 676-77.
 
 
 48
 In W. T. Grant, we also emphasized the inappropriateness of suppression as a remedy since it affected the outcome of litigation. Here, as there, we are loathe to countenance a remedy which will affect the rights of a plaintiff embarked on serious litigation. Id. at 677. Under the circumstances, we agree with Judge Stewart's decision to deny the ancillary relief.
 
 
 49
 In determining that Meister and his law firm, Milgrim Thomajan cannot continue to represent Fund of Funds, we have sought to strike a delicate balance between the Fund's interest in representation by counsel of its choice and the need to maintain high ethical standards within the profession of law. Our decision here is premised on our belief that, above all else, we must maintain public trust in the integrity of the Bar. Accordingly, the order of the district court is reversed in part, affirmed in part.
 
 
 
 [1]
 It is useful, at the outset, to describe the corporate entities involved in this litigation. Fund of Funds, Ltd. and IOS Growth Fund, Ltd., also known as the Transglobal Growth Fund, Ltd., were open end mutual funds organized under the laws of Ontario. They are two of the so-called "IOS Dollar Funds." FOF Proprietary Funds, Ltd. is a wholly-owned subsidiary of Fund of Funds, Ltd. Except as otherwise noted, the three funds will be collectively referred to as "Fund of Funds", "FOF", or "The Funds." Investors Overseas (IOS) Ltd., a corporation also organized under the laws of Canada, exercised complete control over all three funds. It served as the Funds' management advisor as well
 
 
 [2]
 Canon 4 provides that "(a) lawyer should preserve the confidences and secrets of a client"; Canon 5 states the axiom that "(a) lawyer should exercise independent judgment on behalf of a client"; and Canon 9 cautions that "(a) lawyer should avoid even the appearance of impropriety." ABA Code of Professional Responsibility (1976). The Code is recognized by both state and federal courts within this circuit as providing appropriate guidelines for proper professional behavior. NCK Organization Ltd. v. Bregman, 542 F.2d 128, 129 n. 2 (2d Cir. 1976)
 
 
 [3]
 In addition to the disqualification of Meister and his law firm, Milgrim Thomajan & Jacobs, Andersen moved below to suppress as tainted the evidence accumulated by Milgrim Thomajan and Morgan Lewis, and to dismiss the complaint with prejudice
 
 
 [4]
 United States v. Standard Oil Co., 136 F.Supp. 345, 367 (S.D.N.Y.1955), recently quoted and applied in Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp., 518 F.2d 751, 753 (2d Cir. 1975)
 
 
 [5]
 The complaint alleged King first represented that King Resources Inc. (KRC) would sell natural resource assets to the Funds at prices no less favorable than that charged by KRC to its two hundred other purchasers. It is further alleged that King and the FOF board agreed that no more than 10 million dollars of the Funds' assets be invested in natural resource properties
 
 
 [6]
 Among the fraudulent transactions alleged are the following:
 (a) that KRC had purchased an interest in uranium claims and leases for approximately $493,000 but had sold a 37.5% Interest in those claims to the Funds for approximately $1,717,000 and other consideration; (b) that KRC had purchased an interest in exploration and work permits for sulphur on property located in the Canadian Arctic for approximately $91,000 but had sold a 50% Undivided interest to the Funds for approximately $1,425,000 and other consideration; (c) that KRC had purchased an interest in oil rights in Bone Creek 7-15-11-19 for approximately $200 but had sold a 50% Interest for $21,700; and that (d) KRC had purchased an interest in mineral rights described as "Strathcona Prospect" for approximately $270,000 but had sold a 50% Interest to the funds for approximately $10,541,000. In all, the Funds alleged that they had been defrauded of over $120,000,000. The Funds also assert that far more than the 10 million maximum was spent on natural resource assets.
 
 
 [7]
 The two most important revaluations, the Fox-Raff and Arctic PNG Permit revaluations, were undertaken in similar ways. KRC first sold certain natural resource assets to Fund of Funds, and a subsequent sale of a very small part of those assets to a third party was arranged at a price proportionally far higher than that paid by the Fund. Based on the price realized for this small segment of the Fund's initial purchase, the value of the entire 'natural resource asset' was raised. This resulted in revaluations of $1,460,000 in the Fox-Raff transaction, and of $100,000,000 in the Arctic Permit PNG, and in the payment of performance fees to IOS amounting to $10,146,000
 
 
 [8]
 The Liquidation served an important purpose. If the German investors sued directly, they would have to bear the legal expense. But, litigation by the FOF liquidator would be currently financed out of FOF assets, which then aggregated over $250,000,000
 
 
 [9]
 Park Dilks, Jr., the partner at Morgan Lewis, appears to have been instrumental in determining that the Fund would be liquidated under Ontario law (Appendix at 671-4), and equally central to the choice of Orr as liquidator (Appendix at 732)
 
 
 [10]
 Morgan Lewis argued below that it built a Chinese Wall within the firm and that no information passed between the two groups of attorneys and thus that no confidential information was disclosed. The court below found that no such "Chinese Wall" could be created in a single firm. We incline to agree
 
 
 [11]
 Martin Mensch was to deliver the complaint in a seaplane; Dilks testified to his feelings regarding Mensch's tardiness:
 "the seasons change, and as the river becomes iced over, the seaplane ceases to operate, and as August became January, there was no seaplane and there was no complaint."
 
 
 [12]
 Indeed, as we noted in Cinema 5:
 Under the Code, the lawyer who would sue his own client, asserting in justification the lack of 'substantial relationship' between the litigation and the work he has undertaken to perform for that client, is leaning on a slender reed indeed. Putting it as mildly as we can, we think it would be questionable conduct for any attorney to participate in any lawsuit against his own client without the knowledge and consent of all concerned." Id.
 
 
 [13]
 Relevant to this appeal are:
 EC 5-1: The professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of his client and free of compromising influences and loyalties.
 DR 5-105(A): A lawyer shall declined proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected. . . .
 
 
 [14]
 Of particular import on this appeal are:
 EC 4-1: Both the fiduciary relationship existing between lawyer and client and the proper functioning of the legal system require the preservation by the lawyer of confidences and secrets of one who has employed or sought to employ him. . . .
 EC 4-5: A lawyer should not use information acquired in the course of the representation of a client to the disadvantage of the client and a lawyer should not use, except with the consent of his client after full disclosure, such information for his own purposes. Likewise, a lawyer should be diligent in his efforts to prevent misuse of such information by his employees and associates. . . . (emphasis added)
 DR 4-101(B): Except when permitted under DR 4-101(C), a lawyer shall not knowingly:
 (1) Reveal a confidence or secret of his client.
 (2) Use a confidence or secret of his client to the disadvantage of the client. . . .
 
 
 [15]
 Since it is clear to us that Meister and his law firm, Milgrim Thomajan, must be disqualified under Canons 4 and 5, we do not reach the question of whether Canon 9 would alone warrant disqualification
 
 
 [16]
 In New York, as elsewhere, it is beyond doubt that a lawyer is bound to conduct himself as a fiduciary or trustee of his or her client's interests, and that he or she must exercise the utmost good faith, honesty, integrity and fidelity. See In Re Kelly, 23 N.Y.2d 368, 296 N.Y.S.2d 937, 244 N.E.2d 456 (1968). For example, an attorney who collects money from a client and does not pay it over ordinarily holds those funds as a trustee rather than as a debtor of his client. In Re Peltz, 23 A.D.2d 173, 259 N.Y.S.2d 522 (1965)
 
 
 [17]
 Behavior which would contravene Canon 4 can also violate Canon 5. Where, as here, the confidences of a current and actual client are presumed to have been disclosed, the lawyer's activity clearly contravenes Canon 4's directive interdicting such disclosure. Under such circumstances, however, the behavior is also a breach of Canon 5's duty of undivided loyalty
 
 
 [18]
 Counsel on appeal disagree fervently over the precise time at which Meister knew of Morgan Lewis's adverse representation of Andersen. In our review of the record, we are satisfied that Meister knew of Morgan Lewis's actual and current representation of Andersen no later than July 1974, fully seven months before the action against Andersen was filed. On July 17, 1974, John Lewis, a partner at Morgan Lewis, sent Meister a copy of a letter to Rino Stradiotto, of Borden & Elliot, which referred to Morgan Lewis as "the solicitors" for Arthur Andersen. And it is hard to believe that, when Meister and Milgrim Thomajan were called in to "substitute" for Morgan Lewis, he or his firm were unaware of the precise relationship between Andersen and Morgan Lewis
 
 
 [19]
 See Consolidated Theatres v. Warner Bros. Cir. Man. Corp., 216 F.2d 920, 927 (2d Cir. 1954)
 
 
 [20]
 It is clear that both actions are related. They arise out of the same operative facts regarding the natural resource assets situation, and Andersen's supposed wrongdoing, the failure to discover and disclose the fraudulent scheme, is similar to that alleged against the law firm of Willkie Farr & Gallagher
 
 
 [21]
 Appellee suggests that, to impute the receipt of confidences to Milgrim Thomajan, would clear the way for endless chains of imputation. We hardly think that, in light of the close association of Morgan and Milgrim, such a specter is presented by the facts before us