Daniel L. RODE, Plaintiff,

v.

Ross M. BRANCA and Lasertronix,
Inc., Defendants.

No. 79 C 1690.

United States District Court,
E. D. New York.

Dec. 13, 1979.

Stroock & Stroock & Lavan, New York
City by Jay P. Mayesh, Gerald Greenberger,
New York City, of counsel, for plaintiff.

Lunney & Crocco, New York City by
Charles A. Crocco, Jr., New York City, for
defendant.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Plaintiff, a holder of a Ph.D. in Applied
Physics from Case Western Reserve, sues in
a six count complaint for rescission of an
Agreement dated January 15, 1977, on the
grounds of fraud in the inducement, uncon-
scionability, breach of contract and mistake,
for a declaration that the defendants have
no interest in his alleged invention and for
punitive damages for unethical conduct.

Defendant Ross M. Branca ("Branca"), a
New York attorney who also holds a degree
in business administration, denies all of the
material allegations in the complaint, sets
forth four affirmative defenses and four
counterclaims in which he seeks specific
performance and accounting and, in the
event the Court orders rescission, an award
for his legal fees.

At the request of the plaintiff, the Court
is presiding over a bifurcated trial, holding
in abeyance Branca's counterclaims for le-
gal fees.

### I

The facts are as follows:

Following his acquisition of his Ph.D.,
plaintiff went to work for Bell Telephone
Laboratories ("Bell") and prior to his termi-
nation in January of 1979 he had risen to
Technical Group Supervisor in the field of
semiconductor technology. During his em-
ployment with Bell, plaintiff claims to have
invented a "Product" which converts elec-
tricity into light and which he claims is
novel and has foreseeable profitable appli-
cations in several electronic communica-
tions, military, process control, optical, com-
puter and other systems.

In or about 1973, plaintiff met Branca
socially. They became friends through
their fiancès who were neighbors in New
Jersey. In 1976 they first discussed the
Product. Their discussions eventually led
to an understanding that Branca would at-
tempt to find financial backing for the
Product and in this connection Branca, in
November 1976, undertook to form the de-
fendant Lasertronix, Inc. ("Lasertronix") as
a Delaware corporation. Thereafter, the
plaintiff and Branca entered into negotia-
tions in order "to fix their rights and re-

sponsibilities as between themselves" (Exhibit 1). Several draft agreements were prepared, discussed and edited into a penultimate draft (Exhibit 2), and a final draft (Exhibit 1) which the parties signed and acknowledged before a New Jersey lawyer on January 15, 1977.

Plaintiff testified that Branca was acting as attorney for plaintiff, the corporate defendant, and himself, and that prior to the execution of the agreement Branca had assured him that the agreement "does not mean anything unless I get the money and you join it" (i. e., presumably the corporation). Plaintiff's wife testified that she overheard this representation.

Branca testified (and it does not appear to be disputed) that he spent substantial time and effort in attempting to obtain funding for the defendant corporation and the Product. Among others, he talked to representatives of IBM, General Telephone and Electronics, International Telephone and Telegraph Company, Newport Securities, Harris Semiconductor and Valtec. More significantly, Branca produced in 1978 and both he and the plaintiff talked to Richard Endres, a consultant for Amp Corporation and representatives of Data Service Ventures ("DSV"). But all of these prospective investors in 1978 rejected the business plans which plaintiff and Branca had prepared and presented to them primarily because of the estimated cost of the project.

When plaintiff lost his position in January 1979 with Bell after Bell learned of his association with Lasertronix, Inc., he undertook, at the suggestion of Branca, to communicate and meet again with Richard Endres in an attempt to interest him in working further on the project. He was successful, and in the winter and early spring of 1979 plaintiff and Endres rewrote a business plan for the Product which, among other things, described the Product as that of Lasertronix. They also submitted this business plan to Branca who made certain suggestions with respect thereto. The principal difference between the new business plan and the one formulated by plaintiff

and Branca lay in the amount of funds that would be required to develop the Product. Thereafter, Endres took plaintiff to EMW Ventures ("EMW") and back to DSV. Both firms became interested and loaned the project $125,000.00 and indicated that they would make a further investment in the event a new company (Liteson Corp.) were formed and Endres was named the president thereof.

Mr. Endres then took plaintiff to a Philadelphia attorney who drafted an agreement (Exhibit A) to be presented to Branca pursuant to which the agreement of January 15, 1977, would be rescinded, a new corporation (Liteson) would be formed, and Branca would be given 4% of the common stock of Liteson if he put up $30,000.00 of new money. Branca, however, refused to accept this proposal and plaintiff commenced this lawsuit.

## II

Plaintiff claims that it was Branca's duty under their arrangement to find and furnish the requisite funding for a product, and not having done so Branca is not entitled to the benefits of the agreement dated January 15, 1977. The difficulty with this position, of course, is that the written agreement (Exhibit 1) between the parties does not so provide. Plaintiff says, however, that the oral agreement between them was that the written agreement (Exhibit 1) between them would be, in effect, meaningless unless Branca obtained the requisite funds. Assuming arguendo that the terms of the written agreement dated January 15, 1977 can be altered in such fashion, the fact remains that while Branca was not *solely* responsible for the production of the $125,000.00 loan from DSV and EMW and for the indicated interest in further investments from these sources, he was responsible for the initial production of Richard Endres who introduced both EMW and DSV to the plaintiff.

Moreover, in the interim between the execution of the agreement and the production of the money, the parties were at the very least acting as joint venturers or part-

ners under the name of Lasertronix, Inc. Despite Branca's inactivity on behalf of Lasertronix during a period, nothing occurred to indicate that plaintiff and Branca had consciously stopped acting in concert with respect to the Product. Indeed, had Branca himself undertaken the later successful overture to Endres, plaintiff undoubtedly would have still considered the January 15, 1977, agreement to be fully in effect and would have proceeded according to its provisions.

Finally, the Court has a great deal of difficulty with plaintiff's thesis that Branca's conduct was "fraudulent", "unconscionable", "unethical", etc. The most that can be said for plaintiff's position, if one accepts his wife's and his testimony, is that the parties agreed to hold the written agreement in effect in escrow until money was obtained. This interpretation finds some support in that many of the provisions of the written agreement would have been meaningless prior to the acquisition of the requisite funds, e. g., ¶ 12 providing for the payments of salaries and dividends, etc. The Court is convinced, however, that while the parties may have contemplated a minimum of participation initially in the fund raising process by the plaintiff while he was employed by Bell or some other corporation, he was required to devote such time and attention as he had available to the best interests of Lasertronix and the Product. The fact that he and Mr. Endres were successful in their second efforts to obtain funds for the Product whereas he and Branca had been unsuccessful in their first attempt is wholly immaterial. In short, now that funds are available, the alleged condition precedent to the vitality of the written agreement dated January 15, 1977, has been extinguished and the same is in full force and effect and must be honored as between the plaintiff and the defendants Branca and Lasertronix, Inc..

In arriving at this conclusion, we have determined that Branca did not attempt to act as Rode's personal attorney, but as a co-venturer more interested in the commercial success of their efforts than in dispensing legal advice to Rode.[1] In this regard, we note that Rode never retained Branca, either formally or informally, as his personal attorney, nor did he pay him any fee for legal services. Without a finding that Branca acted as Rode's personal attorney, we are without a basis for concluding that Branca abused his position as a member of the Bar and acted unconscionably or unethically in his dealings with Rode. Moreover, we had the opportunity to observe the demeanor of both principals on the witness stand, and from that we are convinced that Branca conducted himself throughout with sincerity and with no conscious or inadvertent abuse of Rode's trust.

Even if we were to find that Branca had acted as Rode's attorney, Branca's actions did not conclusively show an unconscionable or unethical attempt to defraud Rode. Plaintiff cites Disciplinary Rules 5–101(A) and 5–104(A) of the A.B.A. *Code of Professional Responsibility* as the basis for his contention that Branca breached the fiduciary duty owed to Rode.[2] He fails, however, to make a number of showings critical to a finding that those provisions were breached. For example, he fails to demonstrate that he was unaware of any possibility of conflict with Branca because of the latter's position. While it is true that at no time did Branca sit down with Rode to discuss this subject and nothing else, we are not

---

1. To the extent that he rendered legal services, they would appear to have been for their joint venture and/or Lasertronix and all of the same were done with the full knowledge of Rode.

2. DR 5–101(A) provides:
   "Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of the client will be or reasonably may be affected by his own financial, business, property, or personal interests."
   DR 5–104(A) provides:
   "A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure."

convinced that Rode could not have gleaned the equivalent of "full disclosure" from his active involvement in the arrangement and the drafting of the agreement. Further, and perhaps conclusively, we are not convinced that Rode and Branca had "differing interests" in the arrangement. The testimony of both Rode and Branca made clear that they sought the same end, commercial success for Lasertronix and financial gain thereby accruing to both of them. The unity of their interests in this goal overrides any slight variations in their respective duties and rights, such as corporate voting rights, the unanimity provisions, and the dissolution provisions.

Similarly, the cases cited by plaintiff (Plaintiff's Post-Trial Brief, at 16–17) for the proposition that Branca acted short of the standard of "utmost good faith, honesty, integrity and fidelity," *Fund of Funds Ltd. v. Arthur Andersen & Co.,* 567 F.2d 225, 233 n. 16 (2d Cir. 1977), are readily distinguishable. In *Hafter v. Farkas,* 498 F.2d 587 (2d Cir. 1974) (per curiam),. the court dealt with the narrow issue of whether an attorney acted improperly in demanding that a judgment in favor of his client be satisfied by a certified check payable only to himself as attorney. The court held that he had, basing its decision more on the fact that the attorney "did not . . . [follow] commonly accepted practice", *Id.* at 590, than on any breach of the attorney's fiduciary duty to his client.[3] Likewise, *Fund of Funds, supra,* offers only broad generalities about the lawyer's fiduciary

duties, in the context of a dispute among two major law firms and a Big Eight accounting firm, a situation clearly different from the one here.[4] And in *Howard v. Murray,* 38 N.Y.2d 695, 382 N.Y.S.2d 470, 346 N.E.2d 238 (1976), the most recent New York case cited by plaintiff, the court rendered a contrary disposition than that sought by plaintiff here. The court held that findings below that an attorney had acted without fraudulent intent and that his client had "full knowledge of the material facts" compelled the conclusion that the attorney had not violated his fiduciary duty to his client, even though he derived financial benefit from his dealings with the client. Once such findings were made, the only question remaining was whether the attorney made "reasonable use . . . of the confidence reposed in him." *Id.,* 38 N.Y.2d at 699, 382 N.Y.S.2d at 471, 346 N.E.2d at 239. The court determined that he had.

We make a similar determination with regard to Branca.[5] We conclude that Branca made no unreasonable use of any of Rode's confidences, acted without intent to defraud Rode, and comported himself within the ethical standards set forth in the *Code of Professional Responsibility* and the relevant case law.

Accordingly, plaintiff's complaint must be, and the same hereby is, dismissed, and defendant's counterclaims are also dismissed since they concededly are moot.

SO ORDERED. Submit judgment on notice.

---

**3.** Moreover, the court indicated that a more likely instance of breach of the fiduciary duty was the attorney's act of pursuing the very appeal which led to the court's opinion without the client's knowledge. In dictum, the court ventured that the bringing of the appeal, without disclosure to the client, "could well be deemed to constitute a breach of that [fiduciary] relationship." *Id.* at 589.

**4.** Typical of the advice offered by the court (per Chief Judge Kaufman) in *Fund of Funds* is the following admonition:

"When dealing with ethical principles, . . . we cannot paint with broad strokes. The lines are fine and must be so marked. Guideposts can be established when virgin ground is being explored, and the conclusion in a particular case can be reached only after

painstaking analysis of the facts and precise application of precedent."
*Id.,* 567 F.2d at 227, *quoting United States v. Standard Oil Co.,* 136 F.Supp. 345, 367 (S.D.N.Y.1955) (footnote omitted). *See also Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.,* 518 F.2d 751, 753 (2d Cir. 1975).

**5.** Rode was no "babe in the woods" in the quasi legal/commercial world as demonstrated by his attempt to exploit his fiduciary relationship with his employer, Bell. When one questions another's ethics one should keep in mind Benjamin Franklin's admonition, to wit: "Don't throw stones at your neighbors', if your own windows are glass." Poor Richard's Almanac for 1735.