11-1565-cv
*Fair Laboratory Practices Assocs. v. Quest Diagnostics, Inc.*

# In the
# United States Courts of Appeals
## For the Second Circuit

————

AUGUST TERM 2012
No. 11-1565-cv

UNITED STATES OF AMERICA,
*Plaintiff*,

FAIR LABORATORY PRACTICES ASSOCIATES,
*Plaintiff-Appellant*,

*v.*

QUEST DIAGNOSTICS INCORPORATED, UNILAB CORPORATION,
D/B/A QUEST DIAGNOSTICS, AND XYZ CORPORATIONS 1-100,
*Defendant-Appellant*,

————

Appeal from the United States District Court
for the Southern District of New York.
No. 11-1565-cv—Robert P. Patterson, *Judge*.

————

ARGUED: AUGUST 23, 2012
DECIDED: OCTOBER 25, 2013

————

Before: CABRANES, STRAUB, and HALL, *Circuit Judges*.

————

This appeal reflects the tension between an attorney's ethical duty of confidentiality and the federal interest in encouraging "whistleblowers" to disclose unlawful conduct harmful to the government. We consider two questions: (1) whether the United States District Court for the Southern District of New York (Robert P. Patterson, *Judge*) correctly held that a former general counsel to defendant violated his ethical obligations under the New York Rules of Professional Conduct ("N.Y. Rules") by participating in this *qui tam* action; and, if so, (2) whether the District Court erred in dismissing the complaint and disqualifying plaintiff, all of its general partners including the former general counsel, and its outside counsel from bringing any subsequent *qui tam* action based on similar facts.

First, we agree that the attorney in question, through his conduct in this *qui tam* action, violated N.Y. Rule 1.9(c) which, in relevant part, prohibits lawyers from "us[ing] confidential information of [a] former client protected by Rule 1.6 to the disadvantage of the former client," N.Y. Rule 1.9(c), except "to the extent that the lawyer reasonably believes necessary . . . to prevent the client from committing a crime," *id.* 1.6(b)(2).

Second, we hold that the District Court did not err by dismissing the complaint as to all defendants, and disqualifying plaintiff, its general partners, and its outside counsel on the basis that such measures were necessary to avoid prejudicing defendants in any subsequent litigation on these facts.

Affirmed.

————

ANDREW H. SCHAPIRO, Quinn Emanuel Urquhart & Sullivan, LLP, New York, NY, (Charles P. Greenman, Karen F. Lederer, Elliot Cohen, George A. Somerville, Christina H. Bost Seaton, Troutman Sanders LLP, New York, NY; Philip R. Michael, Michael Law Group, P.C., New York, NY, *on the brief*), *for Plaintiff-Appellant*.

PETER D. KEISLER, Sidley Austin LLP, Washington, DC (Richard D. Raskin, Scott D. Stein, Allison W. Reimann, Sidley Austin LLP, Chicago, IL; Kevin McGinty, Mintz Levin Cohn Ferris Glovsky and Popeo, P.C., Boston, MA, *on the brief*), *for Defendants-Appellees*.

————

JOSÉ A. CABRANES, *Circuit Judge*:

Plaintiff appeals from the July 12, 2011 judgment of the United States District Court for the Southern District of New York (Robert P. Patterson, *Judge*) dismissing this *qui tam* action and disqualifying plaintiff, its individual members—including a former general counsel to defendant—and its outside counsel from bringing a subsequent *qui tam* action on the basis that the suit was brought in violation of the general counsel's ethical obligations under the New York Rules of Professional Conduct (the "N.Y. Rules").[1]  The issues

---

[1] The current version of the New York Rules of Professional Conduct took effect on April 1, 2009, and is reprinted with amendments in N.Y. Jud. Law App. (McKinney 2013).  The District Court evaluated this claim under a version of the New York Code of Professional Responsibility which has since been replaced by

on appeal arise out of the tension between an attorney's ethical duty of confidentiality and the federal interest in encouraging "whistleblowers" to disclose unlawful conduct harmful to the government.

We consider here two questions: (1) whether the District Court correctly held that the former general counsel to defendant violated his ethical obligations under the N.Y. Rules by participating in this *qui tam* action; and, if so, (2) whether the District Court erred in dismissing the complaint and disqualifying plaintiff, all of its general partners including the former general counsel, and its outside counsel from bringing any subsequent *qui tam* action based on similar facts.

We agree that the attorney in question, through his conduct in this *qui tam* action, violated N.Y. Rule 1.9(c) which, in relevant part, prohibits lawyers from "us[ing] confidential information of [a] former client protected by Rule 1.6 to the disadvantage of the former client," N.Y. Rule 1.9(c), except "to the extent that the lawyer reasonably believes necessary . . . to prevent the client from committing a crime," *id.* 1.6(b)(2).

In addition, we hold that the District Court did not err by dismissing the complaint as to all defendants, and disqualifying plaintiff, its individual relators, and its outside counsel on the basis that such measures were necessary to avoid prejudicing defendants in any subsequent litigation on these facts.

---

the current N.Y. Rules cited in this opinion, and relied upon by the parties in their briefs.  The rules are substantively unchanged, but the language of the earlier version applied by the District Court is noted for reference throughout the opinion.

Accordingly, we affirm the July 12, 2011 judgment of the District Court.

## BACKGROUND

Plaintiff-appellant Fair Laboratory Practices Associates ("FLPA" or "plaintiff") brought this *qui tam* action[2] pursuant to the federal False Claims Act ("FCA")[3], 31 U.S.C. §§ 3729-3733, against defendants-appellees Quest Diagnostics Incorporated ("Quest") and Unilab Corporation ("Unilab")[4] for alleged violations of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b ("AKS").[5] One of FLPA's

---

[2] "*Qui tam* is short for '*qui tam pro domino rege quam pro se ipso in hac parte sequitur*,' which means 'who pursues this action on our Lord the King's behalf as well as his own.'" *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 463 n.2 (2007). The False Claims Act's *qui tam* provision allows "a private plaintiff, known as a relator, [to] bring[ ] suit on behalf of the [g]overnment to recover a remedy for a harm done to the [g]overnment." *Woods v. Empire Health Choice, Inc.*, 574 F.3d 92, 97 (2d Cir. 2009); *see* 31 U.S.C. § 3730(b). As the "real party in interest" in a *qui tam* action, *United States ex rel. Eisenstein v. City of New York, New York*, 556 U.S. 928, 930 (2009) the government may intervene and take over prosecution of the lawsuit, 31 U.S.C. § 3730(b)(2), (4). In such cases, however, the relator is still entitled to a share of any recovery. 31 U.S.C. § 3730(d).

[3] The FCA creates a cause of action against one who "knowingly presents, or causes to be presented , a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1). Plaintiff also brought claims under the false claims statutes of several states.

[4] FLPA also sued XYZ Corporations 1-100, which are unnamed entities allegedly controlled by Quest.

[5] Title 42 U.S.C. § 1320a-7b(b)(2) provides that

whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—(A) to refer an individual to a person for the furnishing or

general partners, Mark Bibi, was formerly General Counsel to defendant Unilab. The facts set forth below are drawn from the record on appeal, including the account of facts found by the District Court.

## A. The Parties

Quest is a Delaware corporation founded in 1996 and headquartered in New Jersey that provides diagnostic medical testing services for managed care organizations ("MCOs")[6] and independent practice associations ("IPAs")[7] nationwide. In 2003, Quest acquired Unilab—a clinical laboratory company headquartered in California—through a "cash tender offer." Unilab became a wholly-owned subsidiary of Quest through a subsequent merger.

---

arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

[6] MCOs "are entities that, for agreed upon fees, terms, and conditions, undertake to pay the health care costs of its enrollees. Such plans are an alternative to traditional indemnity health insurance plans." Joint App'x 209.

[7] The Second Amended Complaint ("Complaint") describes the relationship between IPAs and MCOs as follows: "In some cases, rather than contracting with individual physicians . . . , an MCO contracts with [IPAs], and the [IPA], in turn, contracts with hospital providers and independent clinical laboratory providers such as the Defendants. In other cases, a large [IPA] operates as a full-fledged MCO." Joint App'x 210.

FLPA, the "relator" in this *qui tam* action, is a Delaware general partnership formed in 2005 by three former Unilab executives, Andrew Baker ("Baker"), Richard Michaelson ("Michaelson"), and Mark Bibi ("Bibi" and jointly, the "individual relators") for the purpose of bringing this *qui tam* action. The individual relators worked for Unilab prior to its acquisition by Quest in 2003. Baker was Unilab's Chairman and Chief Executive Officer from 1993 to about December 1996. Michaelson was Unilab's Chief Financial Officer from 1993 to January 1998, and was a director of and consultant to Unilab from January 1998 to November 1999. Bibi was Unilab's Vice President, Executive Vice President, Secretary, and General Counsel from November 1993 to March 2000, and then served only as an Executive Vice President through June 2000, after which he was retained as a consultant by Unilab until December 2000.

Bibi's role as Unilab's General Counsel is central to the issues presented on appeal. Bibi, who has been practicing law in New York since 1985, was Unilab's sole "in-house" lawyer from 1993-2000. In that capacity, he was responsible for all of Unilab's legal and compliance affairs, such as advising Unilab on matters relating to its MCO contracts and managing all litigation against the company.

### B. The Alleged Scheme

FLPA alleges that "[f]rom at least 1996 through at least 2005, Unilab and Quest violated the AKS[8] by operating a 'pull-through' scheme by which they charged MCOs and IPAs commercially unreasonable discounted prices [on non-federal business] to induce referrals of Medicare and Medicaid business and then billed the Medicare and Medicaid business to the Government at dramatically

---

[8] For the text of the Anti-Kickback Statute, s*ee* Note 5, *ante*.

higher prices than those charged to the MCOs and IPAs [on the non-federal business]." Appellant's Br. 6 (citing Complaint ¶¶43-52). Specifically, FLPA argues that the "commercially unreasonable discounted prices" constituted "kickback[s], bribe[s] or rebate[s]" insofar as they were designed to induce referrals of Medicare and Medicaid business. Appellant's Br. 6 (internal quotation marks omitted).

Between 1993 and 1996, the individual relators began to question whether Unilab's pricing structure violated the AKS. For example, as Chief Financial Officer, Michaelson allegedly knew that Unilab often charged its MCO clients prices that were sometimes less than 50% of Unilab's actual testing costs. And Bibi allegedly advised Baker that Unilab's pricing structure, as it was then formulated, potentially facilitated "kickbacks."

In response to these concerns about Unilab's pricing structure, "Unilab, under its then-CEO [Baker], established a new pricing policy . . . that included negotiated increases to the rates under its existing contracts." Joint App'x 213. Specifically, in 1996 Unilab delivered a letter to its MCO and physician-association customers "stating that it was reserving its contractual right to terminate its contract with that customer and would, in thirty days, cease providing laboratory services to any customer that did not agree to a price increase." *Id.* Following Unilab's notice that it was raising its prices, some of Unilab's "customers began to slowly slip away to [its] competitors." *Id.* at 214.

FLPA asserts that Baker's tenure as CEO ended in 1997 as a result of the falling profits caused by this increase in Unilab's prices. When Baker left, Unilab's shares were selling for less than $3 per share. In 1999, Kelso & Co. completed a leveraged buy-out of Unilab for $5.85 per share and installed a new management team, including

Robert Whalen as CEO. Whalen reversed course from Baker's pricing policy, informing other executives that "Baker's increased pricing had been a mistake, and that Unilab needed to (i) accept commercially unreasonable contracts with MCOs and physician associations and (ii) implement a strategy that required physicians to refer, and the MCOs to arrange for or recommend that physicians refer, fee-for-service business, including Medicare and Medicaid-reimbursable business, to Unilab." *Id.* at 215-16.

In December 1999, the U.S. Department of Health and Human Services Office of Inspector General ("OIG") published Advisory Opinion ("AO") 99-13, which addressed the pricing practices of clinical pathologists. In particular, AO 99-13 indicated that if the prices offered to MCOs on non-federal business were below "actual cost," such an arrangement "might" violate the AKS because the OIG would infer that such discounts were offered for the purpose of inducing physicians to refer their Medicare and Medicaid business.

The month after AO 99-13 was published, Bibi had a meeting with Whalen during which Bibi stated his "personal opinion," that AO 99-13 created an inference of illegality with respect to Unilab's existing pricing structure. Whalen allegedly instructed Bibi to work with outside counsel to "find a way around" AO 99-13. In response Bibi obtained an opinion letter from an outside law firm, Winston & Strawn, on this issue.[9] Bibi never reported his concerns to the Unilab Board.

---

[9] The District Court reviewed *in camera* the Winston & Strawn opinion letter, which was never produced to FLPA's counsel, and referred to the letter in its Opinion and Order. FLPA contends that this was error. It argues that "[w]hen one side, seeking to block consideration of relevant matter, asserts an evidentiary privilege, the court may inspect the evidence *in camera* . . . for the limited purpose of determining whether the asserted privilege is genuinely applicable. . . . [I]f the

FLPA alleges that Bibi was subsequently "frozen out" by Unilab's management as a result of his concerns related to Unilab's pricing structure and was no longer asked for advice on compliance matters. By March 2000, Bibi had been replaced as General Counsel.

After the individual relators left Unilab, the company allegedly "continued its illegal pull-through strategy and as a result significantly improved its profitability." *Id.* at 216. In 2003, Quest acquired Unilab at a price of $26.50 per share. According to Bibi, Baker—who had sold his remaining Unilab shares for $5.85 per share three years earlier— felt "shortchanged." Baker contacted Jeffrey Lanzolatta, a longtime Unilab executive, who allegedly told Baker that Unilab "had become very profitable engaging in the pull-through practice." *Id.* at 918. Baker relayed this information to Bibi, stating that he was in a tax dispute with Unilab/Quest and "wanted to go after them . . . . [t]hrough a *qui tam* lawsuit." *Id.*

---

court's finding is that the privilege does apply, then the court may not rely upon the information in reaching its judgment." *Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986) (citations omitted). Here, however, the pertinent inquiry was not the effect of the letter on the merits of FLPA's case, but whether the information was subject to the attorney-client privilege so as to trigger Bibi's ethical obligations under the N.Y. Rules. *See id.* ("Only in the most extraordinary circumstances does our precedent countenance court reliance upon ex parte evidence *to decide the merits of a dispute*." (emphasis supplied)). Under the circumstances here, *in camera* review is appropriate and the documents in question need not be disclosed to the parties. *Cf. In re The City of New York*, 607 F.3d 923, 948-49 (2d Cir. 2010) (explaining that a proper procedure for determining whether certain materials are privileged is to "require that the party possessing the documents appear *ex parte* in chambers to submit the documents for *in camera* review by the judge, after which the materials can be returned to the custody of that party").

## C. Procedural History

Baker initiated the filing of this *qui tam* action and invited Michaelson and Bibi to join him as individual relators; in particular, he believed Bibi's status as a lawyer "would improve our credibility with the government." *Id.* at 920. Recognizing the potential ethical implications of a former general counsel bringing a *qui tam* lawsuit against his former company and client, Bibi consulted the N.Y. Rules and the American Bar Association's Model Rules of Professional Conduct to determine whether he could participate. Bibi concluded that certain exceptions to the attorney-client confidentiality rules permitted his participation, and "did not feel it was necessary" to verify his understanding with the New York state bar. *Id.* at 932.

On January 1, 2005, FLPA was formed for the purpose of acting as a relator in one or more *qui tam* actions against defendants for alleged violations of the AKS. Pursuant to the FLPA partnership agreement, Bibi stands to collect 29% of any *qui tam* recovery, while Baker and Michaelson would receive 57% and 14%, respectively. On June 7, 2005, FLPA filed this *qui tam* action in the Southern District of New York. After FLPA filed the operative Second Amended Complaint ("Complaint") on May 18, 2010,[10] the District Court permitted defendants to take discovery regarding whether Bibi and FLPA had improperly used or disclosed Unilab's confidences in this lawsuit. Following the completion of this discovery, defendants filed a motion to dismiss the Complaint, arguing that Bibi's participation in this *qui tam* action violated two provisions of the N.Y. Rules.

First, defendants argued that Bibi violated N.Y. Rule 1.9(a), known as the "side-switching" rule, which provides that

---

[10] The complaint was filed under seal in accordance with procedures governing the FCA. *See* 31 U.S.C. § 3730(b)(2).

> [a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

N.Y. Rule 1.9(a).[11] Defendants asserted that, by acting as an individual relator in this *qui tam* action, Bibi essentially "switched sides" and represented the government against Unilab, his former client.

Second, defendants argued that Bibi violated the N.Y. Rules by making use of Unilab's confidential information for this litigation. Pursuant to N.Y. Rule 1.9(c),[12]

> [a] lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter . . . (1) use confidential information[13] of the former client

---

[11] The District Court applied the earlier version of Rule 1.9(a), DR 5-108, *reprinted in* N.Y. JUD. LAW APP. (McKinney 1992), which stated, in relevant part, "a lawyer who has represented a client in a matter shall not, without the consent of the former client after full disclosure . . . [t]hereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client."

[12] The District Court applied the earlier version of Rule 1.9(c), DR 4-101, which stated in relevant part, "Except when permitted . . . , a lawyer shall not knowingly: (1) [r]eveal a confidence or secret of a client [or] (2) [u]se a confidence or secret of a client to the disadvantage of the client [or] (3) [u]se a confidence or secret of a client for the disadvantage of the lawyer or of a third person, unless the client consents after full disclosure."

[13] N.Y. Rule 1.6(a) defines "confidential information" as follows:

protected by Rule 1.6 to the disadvantage of the former client, except as these Rules would permit or require with respect to a current client or when the information has become generally known; or (2) reveal confidential information of the former client protected by Rule 1.6 except as these Rules would permit or require with respect to a current client.

FLPA, in turn, relied upon the exception in N.Y. Rule 1.6(b), which permits a lawyer to "reveal or use confidential information to the extent that the lawyer reasonably believes necessary . . . to prevent the client from committing a crime . . . ." N.Y. Rule 1.6(b)(2).[14]

On March 24, 2011, the District Court granted defendants' motion to dismiss, presumably pursuant to the "inherent power. . . necessarily vested in courts to manage their own affairs," *Chambers v. NASCO, Inc.*, 501 U.S. 32, 49 (1991) (discussing authority to dismiss *sua sponte* for failure to prosecute). *See United States ex rel. Fair Lab. Practices Assocs. v. Quest Diagnostics Inc.*, No. 05 Civ. 5393

---

"Confidential information" consists of information gained during or relating to the representation of a client, whatever its source, that is (a) protected by the attorney-client privilege, (b) likely to be embarrassing or detrimental to the client if disclosed, or (c) information that the client has requested be kept confidential. "Confidential information" does not ordinarily include (i) a lawyer's legal knowledge or legal research or (ii) information that is generally known in the local community or in the trade, field or profession to which the information relates.

[14] The District Court applied the earlier version of Rule 1.6(b)(2), DR 4-101(c)(3), which allowed a lawyer to reveal "[t]he intention of a client to commit a crime and the information necessary to prevent the crime . . . ."

(RPP), 2011 WL 1330542, at *11 (S.D.N.Y. Apr. 5, 2011).[15] The District Court concluded that the FCA did not preempt applicable state ethical rules, and that Bibi's participation in this action violated Rule 1.9(a)—the "side-switching rule"—and Rule 1.9(c)'s prohibition on disclosing client confidences beyond what was "necessary," within the meaning of Rule 1.6(b), to prevent the commission of a crime. *Id.* at *6-11.

In light of these conclusions, the District Court held that the appropriate remedy was to (1) dismiss the Complaint as to all defendants, and (2) disqualify FLPA, each of the individual relators, and FLPA's counsel from bringing this suit or any subsequent suit based on the same facts. *Id.* at *11-13. The District Court reasoned that these measures were "necessary to protect Defendants from the use of their confidential information against them." *Id.* at *13. The District Court clarified that the dismissal in no way affected the right of the United States to intervene and bring an action against defendants. *Id.* at *14. On July 5, 2011, however, the United States gave notice that it was declining to intervene. Judgment was entered on July 12, 2011.

This appeal followed.

## DISCUSSION

On appeal, FLPA argues principally that (1) the District Court erred in holding that Bibi violated his ethical duties under the N.Y. Rules; and (2) the District Court erred in granting an overly broad

---

[15] The District Court noted that "[c]ourts in this District have not hesitated to dismiss claims brought by lawyers [in violation of their ethical obligations]." *Quest Diagnostics*, 2011 WL 1330542, at *11.

remedy in favor of the defendants. We consider each argument in turn.

### A. Bibi Violated N.Y. Rule 1.9(c) by Disclosing Unilab's Confidential Information

We review a district court's grant of a motion to dismiss a *qui tam* action *de novo*. *United States ex rel. Mergent Servs. v. Flaherty*, 540 F.3d 89, 91 (2d Cir. 2008) (reviewing a district court's order dismissing a *qui tam* action on the ground that a non-lawyer cannot bring a *qui tam* action *pro se*).

### 1. The FCA Does Not Preempt State Ethical Rules

As a general matter, the "salutary provisions [of New York's ethical rules] have consistently been relied upon by the courts of this district and circuit in evaluating the ethical conduct of attorneys." *Hull v. Celanese Corp.*, 513 F.2d 568, 571 n.12 (2d Cir. 1975). Nothing in the False Claims Act evinces a clear legislative intent to preempt state statutes and rules that regulate an attorney's disclosure of client confidences. *See See Bates v. Dow Agrosiences LLC*, 544 U.S. 431, 449 (2005) ("In areas of traditional state regulation, we assume that a federal statute has not supplanted state law unless Congress has made such an intention clear and manifest." (internal quotation marks omitted)). *See also Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (same). As one court recognized, "[w]hile the [FCA] *permits* any person . . . to bring a *qui tam* suit, it does not authorize that person to violate state laws in the process." *United States ex rel. Doe v. X. Corp.*, 862 F. Supp. 1502, 1507 (E.D. Va. 1994) (emphasis supplied).

At the same time, we are mindful that the central purpose of the N.Y. Rules—to protect client confidences—can be "inconsistent with or antithetical to federal interests," *Grievance Comm. for*

*S.D.N.Y. v. Simels*, 48 F.3d 640, 646 (2d Cir. 1995), which under the FCA, are to "'encourage private individuals who are aware of fraud being perpetrated against the [g]overnment to bring such information forward,'" *U.S. ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 18 (2d Cir. 1990) (quoting H.R. Rep. No. 660, 99th Cong., 2d Sess. 22 (1986)). In such instances courts must interpret and apply the N.Y. Rules in a manner that "balances the varying *federal* interests at stake." *Simels*, 48 F.3d at 646. We conduct the following analysis with these principles in mind.

## 2. Bibi Violated Rule 1.9(c) by Disclosing Confidential Information Beyond What Was "Necessary" Within the Meaning of N.Y. Rule 1.6(b).

FLPA concedes that N.Y. Rule 1.9(c) governs Bibi's conduct in this case. *See* Appellant's Br. 18. As noted above, N.Y. Rule 1.9(c) provides that

> [a] lawyer who has formerly represented a client in a matter . . . shall not thereafter:
>
> (1) use confidential information of the former client protected by Rule 1.6 to the disadvantage of the former client, except as these Rules would permit or require with respect to a current client or when the information has become generally known; or
>
> (2) reveal confidential information of the former client protected by Rule 1.6 except as these Rules would permit or require with respect to a current client.

N.Y. Rule 1.6(b)(2), in turn, authorizes a lawyer to "reveal or use confidential information to the extent that the lawyer reasonably

believes necessary: . . . (2) to prevent the client from committing a crime . . . ."

Accordingly, review of the District Court's determination that Bibi's participation in the *qui tam* action violated Rule 1.9(c) requires us to decide whether Bibi reasonably believed that (1) the defendants intended to commit a crime when FLPA filed this action in 2005, and (2) the disclosures were necessary to prevent the defendants from committing a crime.

**a.**

We agree with the District Court that "Bibi could have reasonably believed in 2005 that [d]efendants had the intention to commit a crime." *Quest Diagnostics*, 2011 WL 1330542, at *9 (emphasis omitted); *see also id.* at *10 ("[I]t is reasonable to infer that Bibi believed Quest intended to violate the AKS in 2005. . . ."). The District Court made specific factual findings as to what Bibi knew about defendants' alleged violations of the AKS. *See Quest Diagnostics*, 2011 WL 1330542, at *9-10. Defendants do not argue that any finding made by the District Court in this regard was erroneous. Finding no error based on the record before us, we affirm the judgment of the District Court insofar as it rests on its conclusion that Bibi reasonably could have maintained such a belief.

**b.**

The second question is whether Bibi reasonably believed that his disclosures were necessary to prevent defendants from committing a crime. FLPA asserts that it was "necessary"—within the meaning of N.Y. Rule 1.6(b)—for Bibi to reveal the confidential information disclosed in this lawsuit because the terms of the FCA required Bibi to make "'written disclosure of substantially all material evidence and information the person possesses'" to the

government. Appellant's Br. 33 (quoting 31 U.S.C. § 3730(b)(2)). Thus, FLPA argues, "[u]nder elementary principles of the supremacy of federal law, the FCA preempts application of Rule 1.6 . . . ." Appellant's Br. 33-34. We disagree, in light of the balancing principles set forth in Part A.1, *ante*.

Rule 1.6(b)(2) implicitly accounts for the federal interests at stake in the FCA by permitting disclosure of information "necessary" to prevent the ongoing commission of a crime. As illustrated by this very case, Rule 1.6's prohibition on Bibi's disclosures could not have undermined the *qui tam* action in light of the alternative means, discussed below, of exposing the alleged kickback scheme. Because Rule 1.6 itself balances the interests at stake, it need not give way to section 3730(b)(2)'s requirement of full disclosure of material evidence.

Alternatively, FLPA contends that even if Rule 1.6(b) does not give way to section 3730, Bibi complied with its requirements by "tempering his disclosures" until his deposition, when he finally testified as to the details of his conversations with Whalen and revealed the existence of the Winston & Strawn opinion letter upon solicitation by Unilab. Appellant's Br. 34. FLPA argues further that the ongoing nature of the alleged crime necessitated the broad disclosures. *Id.* at 35.

The District Court concluded that "[e]vidence of the continuing crime in 2005 could be shown by evidence of Quest's pricing agreements with MCOs and IPAs in effect in 2005 and not, for example, through Bibi's disclosures [confidential information]." *Quest Diagnostics*, 2011 WL 1330542, at *10. Thus, the Court reasoned, the confidential information divulged by Bibi, dating back to 1996, went beyond what was reasonably necessary to prevent any alleged ongoing crime in 2005, when the suit was filed. *See id.* ("Further, FLPA has not articulated a persuasive reason why

disclosure of confidences from the 1990s to March 2000 would be necessary to prevent the commission or continuation of a crime in 2005.").

We agree with the District Court that the confidential information Bibi revealed was greater than reasonably necessary to prevent any alleged ongoing fraudulent scheme in 2005. By FLPA's own admission, it was unnecessary for Bibi to participate in this *qui tam* action at all, much less to broadly disclose Unilab's confidential information. *See* Appellant's Br. 43 ("Baker and Michaelson each has ample relevant information to bring this case").[16] FLPA could have brought the *qui tam* action based on the information that Baker and Michaelson possessed as former executives of Unilab, or, *if necessary*, Bibi could have made limited disclosures.[17] Instead, Bibi chose to participate in the action and disclose protected client confidences, *see* App'x 900, in violation of N.Y. Rule 1.9(c).

Because we affirm the judgment of the District Court on the grounds that Bibi violated N.Y. Rule 1.9(c), we need not consider whether Bibi also violated N.Y. Rule 1.9(a)—the "side-switching" rule—by participating in this *qui tam* action.[18]

---

[16] We note that the presence of at least two willing relators with ample information to bring the suit further confirms that, under these circumstances, application of Rule 1.9(c) would not affect, much less undermine, the federal interests embodied in the FCA *qui tam* provision.

[17] *Cf.* New York County Lawyers' Ass'n, Committee on Professional Ethics Formal Opinion 746 (Oct. 7, 2013) ("As a general principle, there are few circumstances, if any, in which, in the Committee's view, it would be reasonably necessary within the meaning of [Rule] 1.6(b) for a lawyer to pursue the steps necessary to collect a bounty as a reward for revealing confidential material.").

[18] We note that the District Court gave no indication that the finding with respect to Rule 1.9(a) affected its decision on remedies.

## B. The District Court Did Not Err or "Abuse Its Discretion" in Dismissing the Complaint and Disqualifying FLPA and Its Counsel

Having affirmed the judgment of the District Court insofar as it concluded that Bibi violated N.Y. Rule 1.9(c), we must decide whether the District Court's remedy—dismissing the complaint and disqualifying FLPA, FLPA's counsel, and the individual relators from bringing this action or any subsequent action based on the same facts—was proper.

We review a district court's decision on remedies for ethical violations for "abuse of discretion." *See W. T. Grant Co. v. Haines*, 531 F.2d 671, 676 (2d Cir. 1976) (remedy of disqualification will only be upset upon a showing of "abuse"). A district court has abused its discretion if it "(1) based its ruling on an erroneous view of the law, (2) made a clearly erroneous assessment of the evidence, or (3) rendered a decision that cannot be located within the range of permissible decisions." *NML Capital, Ltd. v. Republic of Argentina*, 680 F.3d 254, 257 (2d Cir. 2012) (internal quotation marks omitted).

We have long recognized "the power of trial judges to disqualify [attorneys] where necessary to preserve the integrity of the adversary process . . ."—most commonly "where the attorney is at least potentially in a position to use privileged information concerning the other side through prior representation . . . . " *Bd. of Ed. of New York v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979) (internal quotation marks omitted). Dismissal of a complaint prepared in reliance on privileged information may also be an appropriate remedy. *See, e.g.*, *Ackerman v. Nat'l Prop. Analysts, Inc.*, 887 F. Supp. 510, 519 (S.D.N.Y. 1993), *aff'd without opinion*, 60 F.3d 810 (2d Cir. 1995) (disqualifying counsel and dismissing complaint prepared in reliance on improper disclosures by the opposing party's former

counsel); *Doe v. A Corp.*, 330 F. Supp. 1352, 1353 (S.D.N.Y. 1971), *aff'd sub nom. Hall v. A. Corp.*, 453 F.2d 1375 (2d Cir. 1972) (dismissing complaint in a derivative action brought by a lawyer against a former client on the basis of confidential information obtained while representing that client, and disqualifying lawyer).

We are conscious that, notwithstanding any salutary effect on attorney ethics or the appearance of fairness, dismissal or disqualification for violations of ethical rules may impede the pursuit of meritorious litigation to the detriment of the justice system. *See, e.g., Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, 236 (2d Cir. 1977) (affirming a district court's refusal to dismiss a complaint due to ethical violations on the ground that "we are loathe to countenance a remedy which will affect the rights of a plaintiff embarked on serious litigation"). Accordingly, courts must balance these competing concerns by limiting remedies for ethical violations to those necessary to avoid "taint[ing] the underlying trial." *Nyquist*, 590 F.2d at 1246; *see also Fund of Funds*, 567 F.2d at 236-37 ("[W]e have sought to strike a delicate balance between the [litigant's] interest in representation by counsel of its choice and the need to maintain high ethical standards within the profession of law."); *cf. Hull*, 513 F.2d at 572 ("[A party's] right to counsel of her choice . . . . must yield . . . to considerations of ethics which run to the very integrity of our judicial process.").

We have repeatedly cautioned that, "[w]hen dealing with ethical principles, we cannot paint with broad strokes." *Fund of Funds*, 567 F.2d at 227 (internal quotation marks, citations and alteration omitted). In evaluating the remedies ordered here, we note FLPA's unusual posture in this litigation by virtue of its status as relator. While FLPA stands to benefit from any recovery in this case, it brings this suit on behalf of the United States government. As such, it acts neither as the real party in interest nor in a

representative capacity. In addition, we recognize the particularly strong federal interest underpinning *qui tam* litigation pursuant to the FCA.

## 1. Dismissal of the Complaint and Disqualification of FLPA

We first address the District Court's decision to dismiss the Complaint as to all defendants and disqualify FLPA and its individual relators. In ordering remedies for Bibi's violation of the N.Y. Rules, the District Court correctly recognized that "[n]ot all violations of the legal code of ethics require dismissal or disqualification of counsel," and that the relevant inquiry was the "possibility of prejudice at trial." *Quest Diagnostics*, 2011 WL 1330542, at \*11 (internal quotation marks omitted). After considering lesser alternatives, the District Court concluded that because FLPA "pursued this litigation on the basis that Bibi could 'spill his guts' and freely disclose Unilab's confidential information," it would be "virtually impossible to identify and distinguish each improper disclosure." *Id.* at \*12. Furthermore, given the concessions by Baker and Michaelson that Bibi had revealed information about confidential communications with Whalen, *id.* at \*5, "[a]llowing Baker and Michaelson to proceed with the suit would allow that taint to proceed into trial," *id.* at \*12.

We do not conclude that the District Court erred or "abused its discretion" in finding that, in view of Bibi's unrestricted sharing of confidential information with the other individual relators, permitting FLPA or any of its individual relators to proceed with the suit would taint the trial proceedings and prejudice defendants. Moreover, FLPA is not the real party in interest here, and, as the District Court emphasized, its decision did not foreclose the

*government* (or, for that matter, a different relator)[19] from bringing suit. Accordingly, dismissal of the Complaint and disqualification of FLPA does not significantly impair the federal interests embodied in the FCA.

Alternatively, FLPA argues that it should be permitted to proceed against Quest, if not Unilab, because Bibi never owed any duty to Quest. Appellant's Br. 46. This argument ignores the fact that "when control of a corporation passes to new management [as a result of, *inter alia*, a merger], the authority to assert and waive the corporation's attorney-client privilege passes as well." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 349 (1985). The District Court thus correctly held that "any obligation Bibi had to Unilab was transferred to Quest upon its purchase."[20] *Quest Diagnostics*, 2011 WL 1330542, at *13. We hold that it was not error for the District Court to conclude that "simply dismissing Unilab from this action would not fully purge the taint associated with Bibi's unethical disclosures of Unilab confidences[,]" *id*.

## 2. Dismissal of FLPA's Counsel

We next consider whether the District Court abused its discretion by *sua sponte* disqualifying FLPA's counsel, Troutman Sanders and the Michael Law Group, on the basis that such

---

[19] Although not expressly stated, we understand the District Court's Order to dismiss the Complaint without prejudice to suit being brought by *different* relators who otherwise meet the statutory requirements of the FCA on similar facts (without improper disclosures).

[20] In addition, the District Court held that "[a] financial judgment against Quest would . . . undoubtedly have effects on Quest's wholly-owned subsidiary, Unilab." *Quest Diagnostics*, 2011 WL 1330542, at *13 (citing Gillers Decl. ¶ 62, Joint App'x 396).

dismissal was "necessary to protect [d]efendants from the use of their confidential information against them." *Id*.

We note at the outset that the ethical violations at issue here were committed by Bibi, a general partner of the *client*, FLPA, and not by counsel in this case. As such, the circumstances of this disqualification do not lend themselves to the "precise application of precedent." *Fund of Funds*, 567 F.2d at 227 (internal quotation marks omitted). We have, however, previously found it necessary to dismiss counsel who had themselves committed no ethical violation, on the basis that "confidences . . . could have been revealed [to them]" that would prejudice a party in litigation. *Id.* at 233 (dismissing co-counsel of a firm that was disqualified due to ethical conflicts because the conflicted firm had shared confidences with its co-counsel).

Here, the District Court concluded that, by virtue of the confidential information likely revealed to them, counsel for FLPA "are in a position to use [defendants' confidential information] to give present or subsequent clients an unfair, and unethical, advantage." *Quest Diagnostics*, 2011 WL 1330542, at *13; *see also Nyquist*, 590 F.2d at 1246 (holding that disqualification may be warranted where the attorney is "potentially in a position to use privileged information concerning the other side"). Moreover, FLPA's disqualification, by virtue of the intimate collaboration with Bibi in the ethics violations, *alleviates* the concern that "[t]he sins of counsel should not be visited upon his client so as to vitiate the

latter's cause of action."[21] *W.T. Grant*, 531 F.2d at 677. In sum, the District Court's decision to disqualify FLPA's counsel was not based on any error of law or fact, and is "located within the range of permissible decisions." *NML Capital*, 680 F.3d at 257 (citations omitted).

## CONCLUSION

To summarize:

(1) The False Claims Act does not preempt state ethical rules governing the disclosure of client confidences; therefore N.Y. Rule 1.9(c), which generally prohibits disclosure of confidential information of a former client, governs a New York attorney's conduct as relator in a *qui tam* action under the False Claims Act.

(2) N.Y. Rule 1.6(b)(2), which permits a lawyer to reveal or use confidential information to the extent that the lawyer reasonably believes necessary to prevent the client from committing a crime, does not justify Bibi's disclosures in this case: Bibi reasonably could have believed in 2005 that defendants intended to commit a crime. His disclosure of Unilab's confidential information, however, went well

---

[21] The suggestion that disqualification of FLPA's counsel is improper because those attorneys did not commit the violation misses the mark. Disqualification is not a sanction but a remedy that seeks to avoid prejudice to the party whose confidences have been revealed and, in so doing, promote the integrity of our justice system. *Cf. Fund of Funds*, 567 F.2d at 227 (noting that "[c]ompliance or noncompliance with Canons of Ethics frequently do not involve morality or venality, but differences of opinions among honest men over the ethical propriety of conduct," but nonetheless dismissing counsel who violated those ethics *and* co-counsel who did not).

beyond what was "necessary" within the meaning of N.Y. Rule 1.6(b)(2) to prevent Unilab from committing a crime inasmuch as there was ample non-confidential information on which to bring an FCA action. Therefore, Bibi's conduct in this *qui tam* action violated his ethical obligations under N.Y. Rule 1.9(c).

(3) The District Court did not err or "abuse its discretion" in dismissing the Complaint and disqualifying FLPA, all of its general partners, and its outside counsel from bringing any subsequent related *qui tam* action, on the basis that such measures were necessary to prevent the use of Bibi's unethical disclosures against defendants.

Accordingly, the judgment of the District Court is **AFFIRMED**.