# IN THE SUPREME COURT OF IOWA

No. 21–0348

Submitted December 15, 2022—Filed May 26, 2023

**IN THE MATTER OF THE GUARDIANSHIP OF J.W.,** Minor Child.

**JACOB VAN CLEAF,** Proposed Guardian,

Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, William A. Price, Senior Judge.

The mother of the proposed protected person in an involuntary guardianship proceeding initiated by the mother's former attorney seeks further review from the court of appeals' reversal of the juvenile court's dismissal of the guardianship petition. **DECISION OF COURT OF APPEALS VACATED; JUVENILE COURT JUDGMENT AFFIRMED.**

Oxley, J., delivered the opinion of the court, in which Christensen, C.J., and Waterman and McDermott, JJ., joined. Mansfield, J., filed an opinion concurring in part and dissenting in part, in which McDonald, J., joined. May, J., took no part in the consideration or decision of the case.

Jacob van Cleaf (argued), Des Moines, appellant, pro se.

Alexis R. Dahlhauser (argued) of Neighborhood Law Group of Iowa, P.C., West Des Moines, for appellee mother.

**OXLEY, Justice.**

In December 2020, Attorney Jacob van Cleaf filed a pro se petition to establish an involuntary guardianship of J.W., the (then) nine-year-old daughter of his former client, whom we will refer to as "Mother." *See* Iowa Code § 232D.204 (2020). Not only was Mother van Cleaf's former client, he (and his law partner) had represented her in previous custody disputes involving her children—including the child over which he now seeks to be named the guardian. The juvenile court dismissed the petition on the basis that van Cleaf could not act as a petitioner in a case to establish a guardianship over his former client's daughter without violating several rules of professional conduct. On appeal, the court of appeals concluded that dismissal was not a proper remedy for any purported ethical violations and reversed the dismissal. On further review, we recognize the court's inherent authority to dismiss an action premised on the rules of professional conduct and conclude the juvenile court did not abuse its discretion under the unique circumstances of this case. We therefore affirm the juvenile court's dismissal.

### I. Factual and Procedural History.

Mother met attorney Jacob van Cleaf in 2013 through Amelia Wildt, who worked as the office manager for van Cleaf's law firm. Mother needed legal assistance in a custody dispute with the father of one of her children, and she hired van Cleaf. Over the next three years, van Cleaf or his law partner, Colin McCormack, represented Mother in four more cases: a domestic violence case and three child custody proceedings. In one of those cases, McCormack filed an

action on behalf of Mother in March 2016 to establish paternity and custody over the child at issue in this case, J.W., which was resolved by default judgment against the biological father in November. Both van Cleaf's and McCormack's representation of Mother ended in all matters in December.

Apparently, though, Mother's relationship with van Cleaf went beyond that of an attorney and a client. According to the petition for involuntary guardianship that started the instant litigation, Mother often left J.W. in the care of either Wildt or van Cleaf, each of whom eventually made a place for J.W. in their respective homes. Accordingly, the petition alleges Wildt and van Cleaf both acted as a de facto guardian for J.W.—Wildt since 2013 and van Cleaf since 2015 (although van Cleaf later asserted that his actions did not rise to the level of a de facto guardian until 2017). Indeed, van Cleaf asserts that J.W. has resided either with Wildt or, more recently, with him since 2014—that is, except for an eleven-month period from June 2018 through May 2019, and "when not actively prevented from doing so by" Mother. In addition to providing J.W. with a home, Wilt and van Cleaf allegedly arranged for J.W.'s medical care, transported her to daycare, and made educational decisions for her when she reached school age. Mother, on the other hand, parented only when convenient, leaving J.W. in Wildt's or van Cleaf's care for months at a time without even visiting J.W.

That all ended on November 30, 2020, when Mother purportedly accosted van Cleaf, took J.W. from his care, and cut off all communications. On December 8, van Cleaf filed the instant petition for involuntary guardianship,

identifying himself and Wildt as copetitioners and proposed coguardians.[1] The juvenile court appointed separate counsel for Mother and for J.W. as the proposed protected person. On motion filed by J.W.'s attorney, the court bifurcated the roles of attorney and court visitor and appointed a separate court visitor to serve J.W.'s best interests.

While attempts to serve Mother with the guardianship petition were underway, Mother's attorney brought to van Cleaf's attention several "serious ethical concerns regarding [his] involvement with this client and matter," and asked van Cleaf to alert the court. Van Cleaf did so, and in response, Mother filed a notice identifying eight specific ethics rules[2] she believed van Cleaf had, or would, violate if he continued in his role as petitioner in this involuntary guardianship proceeding. Mother sought dismissal of the petition in its entirety as well as "[a]ssurance that [neither] Mr. van Cleaf, nor any current or future firm of his employ, will seek guardianship or represent anyone seeking guardianship of any child of . . . Mother."

The juvenile court held an evidentiary hearing limited to the issue of the ethical concerns raised by Mother. Both J.W.'s court-appointed attorney and her court visitor agreed with Mother that van Cleaf had violated obligations owed to

---

[1]Wildt did not sign the petition or file one of her own, and van Cleaf confirmed at the subsequent hearing that he was acting only in his individual capacity and was not representing Wildt. The juvenile court concluded that Wildt was not a party to the proceeding as a copetitioner but remained as a proposed coguardian. That decision was not appealed. As the case reaches us then, van Cleaf is the only petitioner and has identified himself and Wildt as proposed coguardians.

[2]The rules cited were Iowa Rules of Professional Conduct 32:1.7, 32:1.9, 32:1.10, 32:3.7, 32:4.1, 32:4.2, 32:5.1, and 32:5.3. At the subsequent evidentiary hearing, the court sua sponte raised the issue of rule 32:1.8.

Mother as his former client and urged that the proper remedy was dismissal without prejudice so that "either the State of Iowa or another interested party without any ethical obligations to . . . Mother . . . may bring an action on behalf of the minor child to determine the merits of whether or not an actual guardianship is, in fact, appropriate." The juvenile court concluded that van Cleaf violated his duties to Mother as a former client under Iowa Rule of Professional Conduct 32:1.9, in addition to violating rules 32:1.8, 32:5.3(c), and 32:4.2(a).[3] In considering the proper remedy, the court could conceive of "no conditions or combination of conditions that would allow this litigation to go forward without further violations of Jacob van Cleaf's duties to his former client," even if van Cleaf were represented by counsel rather than appearing pro se. Therefore, the court concluded "[t]he only appropriate remedy is a dismissal of the Petition."

We transferred van Cleaf's appeal to the court of appeals, which reversed, finding no legal authority for the juvenile court to order dismissal as a remedy even if van Cleaf had violated, or would violate, the Iowa Rules of Professional Conduct. The court of appeals noted that dismissal would raise "general concerns about" restricting a party's access to the courts and, in any event, the petition sufficiently stated a claim for relief to preclude dismissal as a remedy at the preanswer stage of the proceedings.

---

[3]The violations of rules 32:5.3 and 32:4.2 relate to van Cleaf's attempts to serve Mother in this matter. The juvenile court concluded that while van Cleaf violated these rules in attempting to serve Mother, these violations did not support dismissal of the petition. Mother does not suggest to the contrary on appeal, and we do not address them further.

We granted Mother's application for further review.

**II. Motion to Strike.**

On appeal, Mother moved to strike from the appellate record references to certain exhibits admitted at the evidentiary hearing since they were admitted "for the limited purpose [of] establish[ing] that Mr. van Cleaf had a 'claim' in this case" under Iowa Rule of Professional Conduct 32:1.6(b)(5). Mother cites no authority to support her motion, and under our appellate rules, the exhibits would generally be part of the record on appeal since they were filed in the juvenile court. *See* Iowa R. App. P. 6.801 ("Only the original documents and exhibits filed in the district court . . . , the transcript of proceedings, . . . and a certified copy of the related docket and court calendar entries . . . constitute the record on appeal."). In any event, the exhibits are not necessary to our resolution of the appeal, and we have not considered them. We therefore deny the motion to strike as moot.

**III. Analysis.**

We face two related issues: whether van Cleaf's actions do, or could, violate any rules of professional conduct, and if they do, what can or should be done to remedy any possible violations. We address each issue but in reverse order.

**A. Is Dismissal an Available Remedy?** The court of appeals faulted the juvenile court's failure to identify the legal authority that supported its dismissal of the guardianship petition as a proper remedy for van Cleaf's alleged rule violations, concluding that the court essentially granted a preanswer motion to dismiss. At that stage, the court of appeals reasoned, the court should have

taken all allegations in the petition as true and could not have considered facts outside the petition, including Mother's assertion (assuming it to be legally correct) that van Cleaf's role as her former lawyer prevented both him and Wildt from serving as J.W.'s guardian. The court of appeals is mistaken for two distinct reasons.

First, the court of appeals' assessment of the procedural posture of this case misses that the juvenile court held an evidentiary hearing on (and limited to) the effect of the alleged ethical issues. Even if we analogize Mother's enumeration of alleged ethical violations to a preanswer motion to dismiss, holding an evidentiary hearing on that issue was thus also analogous to construing the "motion to dismiss" as one for summary judgment, since at such hearings the parties present, and the court considers, evidence beyond that contained in the petition. *Cf. George v. D.W. Zinser Co.*, 762 N.W.2d 865, 867 (Iowa 2009) ("As the motion to dismiss in this case relied on 201 matters outside the pleadings and both parties and the court treated it as a motion for summary judgment, we will do so as well."); *Stotts v. Eveleth*, 688 N.W.2d 803, 812 (Iowa 2004) (treating a motion to dismiss as a motion for summary judgment to conserve judicial resources).

We faced a similar situation in *Troester v. Sisters of Mercy Health Corp.*, 328 N.W.2d 308 (Iowa 1982). There, a plaintiff-administrator brought a wrongful-death action against a health center and other defendants on behalf of the decedent's estate. *Id.* at 309–10. In the meantime, separate proceedings in probate court caused the estate to be closed and then reopened, along with the

administrator being discharged and then reappointed. *Id.* at 311. The defendants filed a motion to dismiss the wrongful-death action, asserting that once the estate was closed the plaintiff-administrator lacked the capacity to maintain the suit on behalf of the estate and the court lacked subject matter jurisdiction to hear the case. *Id.* at 310. The plaintiff resisted on the basis that the petition, required to be taken as true, identified her as the acting administrator. *Id.* We held that where the motion challenged the plaintiff's capacity to sue, rather than the merits of the case, it was proper for the district court to consider at least the undisputed subsequent facts and treat the motion as one for summary judgment. *Id.* at 311 ("[W]e find it reasonable to adopt procedures that will avoid the time and cost of a trial on the merits when either the trial court or a party lacks authority to proceed."). We also suggested that "in those cases where evidence is required on these questions, it is a better practice to utilize in the pretrial stage of the case our summary judgment procedure." *Id.*

Mother is essentially challenging whether van Cleaf's ethical obligations prevent him from acting as the petitioner in this proceeding. Because this challenge is separate from the merits, the proceeding before the juvenile court was analogous to the challenge in *Troester*, and the court properly considered the evidence presented at the evidentiary hearing, similar to what it would have considered had this been brought as a summary judgment proceeding.

Second, identified or not, the juvenile court had the inherent authority to address the implications of ethical violations (actual or potential) by those appearing before it. *See State v. Vanover*, 559 N.W.2d 618, 628 (Iowa 1997)

(explaining that "a trial court has the authority and duty to enquire on its own into potential conflicts of interest" that might require disqualification of the defendant's attorney after he was identified as a potential state witness); *see also United States ex rel. Bumbury v. Med–Care Diabetic & Med. Supplies, Inc.*, No. 10–81634–CIV, 2016 WL 4154699, at *2 (S.D. Fla. Feb. 8, 2016) ("The ability to remedy a violation of the ethical code regulating attorney conduct through disqualification, dismissal, or other means comes from the Court's inherent power 'to protect the orderly administration of justice and to preserve the dignity of the tribunal.' " (quoting *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1209 (11th Cir. 1985))); *Slater v. Rimar, Inc.*, 338 A.2d 584, 589–91 (Pa. 1975) (holding that attorney for shareholders in shareholder derivative suit who had previously served as an officer and director for companies being sued had a clear conflict of interest requiring, at a minimum, disqualification, and affirming trial court's order disqualifying the attorney and dismissing the case). It is this inherent authority that allows courts to, for instance, disqualify an attorney whose representation in a case creates a clear conflict of interest.

A court's inherent authority to dismiss an action based on a conflict of interest has been recognized and applied in other jurisdictions. *See Slater*, 338 A.2d at 589–91 (holding that dismissal of a shareholder derivative action was "appropriate where the information on which the suit is bottomed has been supplied altogether by the" shareholder's lawyer's prior representation of the defendant); *see also United States v. Quest Diagnostics Inc.*, 734 F.3d 154, 162, 166 (2d Cir. 2013) ("[T]he District Court granted defendants' motion to dismiss

[a qui tam action brought by defendants' former general counsel], presumably pursuant to the 'inherent power . . . necessarily vested in courts to manage their own affairs.' " (omission in original) (citation omitted) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 49 (1991))). In fact, in *Ennis v. Ennis*, the Wisconsin Court of Appeals reversed a district court's denial of a motion to dismiss premised on ethical violations, correcting the district court's misperception that the ethical issues could only be addressed by the Wisconsin State Bar (which oversaw attorney discipline), not the court. 276 N.W.2d 341, 342–43, 347–48 (Wis. Ct. App. 1979) (holding that "the trial court had the power and responsibility to dismiss the action [seeking to reopen a divorce judgment], or to disqualify [plaintiff-ex-wife's attorney] from proceeding" where the attorney's firm had previously represented the ex-husband in the original divorce proceeding and the attorney refused to voluntarily withdraw from representing the ex-wife).

True, as the court of appeals noted, the professional rules' preamble cautions restraint in addressing violations: "[V]iolation of a rule does not necessarily warrant any other nondisciplinary remedy, such as disqualification of a lawyer in pending litigation." Iowa R. of Prof'l Conduct pmbl., para. [20]. But, as evidenced by the phrase "does not necessarily," the preamble does not foreclose dismissal from being a remedy in the proper circumstances. Indeed, in addition to the courts cited above that have found authority to dismiss a case based on an ethical violation, the Restatement (Third) of the Law Governing Lawyers notes dismissal among the "judicial remedies [that] may be available"

for a lawyer's misconduct. 1 Restatement (Third) of the Law Governing Laws. § 6, at 65–66 (Am. L. Inst. 2000).

While we recognize that there are competing, legitimate interests on both sides of the dismissal equation—van Cleaf's statutory right to bring this petition, *see* Iowa Code § 232D.301(1) (providing that "any person with an interest in the welfare of the minor" can petition for involuntary guardianship), on the one hand, and Mother's constitutional liberty interest in the care, custody, and control of her daughter, *see G.Y. v. S.W.* (*In re Guardianship of L.Y.*), 968 N.W.2d 882, 894 (Iowa 2022), on the other—that cannot mean that dismissal is never an option. As the Wisconsin Court of Appeals observed in *Ennis*,

> The interests which warrant and necessitate this power [to remedy professional misconduct through disqualification or dismissal] in the [district] court are broader than those of the individual litigants. The interests of the public and of the profession are also involved. . . . [T]his issue goes to "the heart of our attorney system." Attorneys and judges alike have a responsibility to protect that system from abuse.

276 N.W.2d at 347. We conclude that dismissal of a case based on the ethical implications of a party-attorney's conduct is within a court's inherent authority in the proper circumstances. That said, we recognize that dismissal is a serious remedy. In the context of disqualifying counsel based on ethical considerations arising from the representation, we have explained that "[b]ecause of the potential for abuse by opposing counsel, 'disqualification motions should be subjected to particularly strict [judicial] scrutiny.'" *Liquor Bike, LLC v. Iowa Dist. Ct.*, 959 N.W.2d 693, 696 (Iowa 2021) (quoting *Macheca Transp. Co. v. Phila. Indem. Ins.*, 463 F.3d 827, 833 (8th Cir. 2006)). "It is not a time to 'paint with

broad strokes', but to carefully examine the specific conduct of each particular case." *Hoffmann v. Internal Med., P.C. of Ottumwa*, 533 N.W.2d 834, 836 (Iowa Ct. App. 1995) (quoting *United States v. Standard Oil Co.*, 136 F. Supp. 345, 367 (S.D.N.Y. 1955)); *see also Quest Diagnostics Inc.*, 734 F.3d at 166 ("[W]hen dealing with ethical principles, we cannot paint with broad strokes." (quoting *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, 227 (2d Cir. 1977))).

We review the juvenile court's use of its inherent authority in this context for an abuse of discretion. *See Liquor Bike*, 959 N.W.2d at 696 (reviewing order disqualifying attorney for abuse of discretion). "A district court 'abuses its discretion when its ruling is based on clearly untenable grounds.' " *Id.* (quoting *NuStar Farms, LLC v. Zylstra*, 880 N.W.2d 478, 482 (Iowa 2016)). We turn to the claimed violations of Iowa Rules of Professional Conduct 32:1.8 and 32:1.9 to determine whether, under these circumstances, dismissal was warranted.

**B. Was Dismissal Warranted Here?** The juvenile court based its decision to dismiss the petition on its conclusion that van Cleaf's conduct did, or at least would, violate Iowa Rules of Professional Conduct 32:1.8 and 32:1.9. Van Cleaf contends that rule 32:1.8 is not implicated because Mother is not a current client. He further contends that rule 32:1.9(a) does not disqualify attorneys from representing *themselves* against former clients and that, even if it does, he should not be disqualified here because his claim is not substantially related to his and McCormack's[4] prior representation of Mother.

---

[4]Any conflict which would disqualify McCormack from representing himself in this litigation under rule 32:1.9 is imputed to van Cleaf via rule 32:1.10(a) unless one of the

1. *Rule 32:1.8.* Taking as true van Cleaf's unchallenged testimony at the evidentiary hearing that he did not become a de facto guardian of J.W. until 2017, after he was no longer representing Mother, van Cleaf still admits that Wildt, his office manager, was acting as a de facto guardian beginning in 2013—i.e., while Mother was van Cleaf's current client. Rule 32:5.3 makes a lawyer responsible for certain conduct of nonlawyer assistants that would violate the rules of professional conduct if engaged in by the lawyer. Iowa R. of Prof'l Conduct 32:5.3(c). Rule 32:1.8 in turn prohibits lawyers from engaging in certain conduct involving current clients, including entering into a business transaction with the client without advising the client to seek independent legal counsel and obtaining the client's informed consent, *id.* r. 32:1.8(a), or using information relating to the representation to the client's disadvantage without the client's consent, except as otherwise permitted, *id.* r. 32:1.8(b). The juvenile court concluded that Wildt's actions of serving as a de facto guardian for J.W. while van Cleaf was representing Mother in custody disputes involving her children was comparable to entering a financial dealing, reasoning that acquiring "a possessory interest as a de[ ]facto guardian is as important [as] any traditional financial transaction." The court refused to "reward" van Cleaf's serious breach of his ethical obligations to use Wildt's position as a de facto guardian to the detriment of his then-client.

---

exceptions in the latter rule is met. Iowa R. of Prof'l Conduct 32:1.10(a); *see also Liquor Bike*, 959 N.W.2d at 697 ("Individual attorney conflicts are imputed to the entire firm with which they are associated."). Since van Cleaf does not challenge the juvenile court's decision to impute conflicts to him, we need not decide whether any of those exceptions would apply here.

We do not disagree with the juvenile court that seeking guardianship of a client's child raises concerns at least as serious as entering into financial dealings with a client. But rule 32:1.8(a) is specific to financial transactions. It is not just that rule 32:1.8(a) is often thought of in that regard; its language is expressly limited to such dealings: "A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client unless" the terms are fair and fully disclosed to the client, the client is advised to seek outside counsel, and the client provides written consent. *Id.* r. 32:1.8(a)(1)–(3). Applying general rules of statutory construction, *see Iowa Sup. Ct. Att'y Disciplinary Bd. v. Att'y Doe No. 639*, 748 N.W.2d 208, 209 (Iowa 2008) (utilizing rules of statutory construction to determine whether time limitation in rules of professional conduct was mandatory or directory), there is simply no way to apply rule 32:1.8(a)'s limitations to the situation at issue here. Rule 32:1.8(a) therefore does not support dismissing the guardianship petition.

2. *Rule 32:1.9(a).* Under subsection (a) of Rule 32:1.9, a lawyer also owes obligations to former clients:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

Iowa R. of Prof'l Conduct 32:1.9(a). "[T]he idea of a lawyer changing sides is at the heart of the prohibition" in rule 32:1.9(a). *Cont'l Res., Inc. v. Schmalenberger*,

656 N.W.2d 730, 738 (N.D. 2003) (quoting Am. Bar Ass'n, *Annotated Model Rules of Professional Conduct* § 1.9, at 151 (3d ed. 1996)).

> At the heart of every "side-switching attorney" case is the suspicion that by changing sides, the attorney has breached a duty of fidelity and loyalty to a former client, a client who had freely shared with the attorney secrets and confidences with the expectation that they would be disclosed to no one else. It is for this reason that the "appearance of impropriety doctrine" was adopted to protect the public, our profession, and those it serves. In short, this much maligned doctrine exists to engender, protect and preserve the trust and confidence of clients.

*Id.* (quoting *Cardona v. Gen. Motors Corp.*, 942 F. Supp. 968, 975 (D.N.J. 1996)).

Rule 32:1.9(a) has been described as "a prophylactic rule to prevent even the potential that a former client's confidences and secrets may be used against him." *Koch v. Koch Indus.*, 798 F. Supp. 1525, 1532 (D. Kan. 1992) (quoting *In re Corn Derivatives Antitrust Litig. (MDL 414)*, 748 F.2d 157, 162 (3d Cir. 1984)) (discussing Kansas's version of rule 32:1.9(a)). Without such a rule, clients may be reluctant to confide completely in their attorneys. The rule helps maintain "public confidence in the integrity of the bar," and it helps protect a client's "right to expect the loyalty of his attorney in the matter for which he is retained." *Id.* (quoting *In re Corn Derivatives Antitrust Litig. (MDL 414)*, 748 F.2d at 162).

Van Cleaf's position—that this rule is not implicated because he is not representing "another person" in a substantially similar matter when he represents himself—is not without support. *See In re Wood*, 634 A.2d 1340, 1343 (N.H. 1993) ("We hold that 'another person' in Rule 1.9(a) is synonymous with 'another client' and does not encompass a lawyer's *pro se* activities."). *In re Wood* involved an attorney's representation of a commercial developer seeking to

develop land in Enfield, New Hampshire, for a mall. *Id.* at 1340–41. Wood's partner also represented the developer when it considered property in nearby Lebanon, New Hampshire, for the same mall project. *Id.* at 1341. When it was discovered that the Lebanon property abutted Wood's personal property, the firm withdrew its representation. *Id.* Wood publicly opposed the development, and the Supreme Court Committee on Professional Conduct claimed that Wood's opposition violated duties he owed to the developer as his former client in the Enfield project. *Id.* at 1341–42. The New Hampshire Supreme Court concluded that Wood's pursuit of his preexisting personal interests in opposing his former client's mall project did not violate New Hampshire's version of rule 32:1.9(a) because Wood was pursuing his own interests, not representing another client. *Id.* at 1342–43.

But the language used in New Hampshire Rule of Professional Conduct 1.9(a) differs from Iowa's rule 32:1.9(a) in a material way. The New Hampshire rule provides:

> A lawyer who has formerly represented a person in a matter shall not thereafter: (a) represent *another person* in the same or a substantially related matter in which *that client's interests* are materially adverse to the interests of both unless the former client consents . . . .

*Id.* at 1342 (emphases added) (quoting N.H. R. of Prof'l Conduct 1.9(a)). The New Hampshire Supreme Court relied on the phrase, "that client's interests," to clarify that the reference to "another person," whom an attorney is barred from representing, is not *any* other person, but is limited to another client. *Id.* ("While Rule 1.9(a) first refers to 'formerly represent[ing] a person' and a lawyer's

obligation to 'not thereafter represent another person,' the remainder of the Rule contains the terms 'that client's interests,' and 'the former client.' The Rule thus refers to the formerly represented person as 'the former client.' 'Another person' is the second client, referred to in the Rule as 'that client.' " (alteration in original)). So read, the New Hampshire Supreme Court concluded that rule 1.9 did not preclude an attorney from representing his own preexisting interests in property that were adverse to a former client's. *Id. But cf. In re Disciplinary Proceeding Against Haley*, 126 P.3d 1262, 1266–67 (Wash. 2006) (en banc) (holding that pro se attorney violated Washington Rule of Professional Conduct 4.2, which provides, "*In representing a client*, a lawyer shall not communicate . . . with a party . . . represented by another lawyer," noting that "[o]ther jurisdictions that have considered the rule's applicability to lawyers acting pro se have generally concluded that the policies underlying the rule are better served by extending the restriction to lawyers acting pro se" (emphasis added)); ABA Comm. on Ethics & Prof'l Resp., Formal Op. 22–502 (2022) (explaining that for purposes of Model Rule 4.2, "[p]ro se lawyers represent themselves as 'a client' ").

> Iowa's rule, however, more broadly prohibits an attorney
>
> who has formerly represented a client in a matter [from] thereafter represent[ing] *another person* in the same or a substantially related matter in which *that person's interests* are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

Iowa R. of Prof'l Conduct 32:1.9(a) (emphases added). "Another person" thus refers to any person other than the former client, which, we believe, includes an

attorney representing himself. This position, too, has support. *See Mac Naughton v. Harmelech*, 338 F. Supp. 3d 722, 727–28 (N.D. Ill. 2018) (concluding that New Jersey Rule of Professional Conduct 1.9(a) (analog to Iowa's rule 32:1.9(a)) "does apply to *pro se* representations" and that an attorney who purchased the judgment against his former client from his client's adversary and then attempted to collect the judgment against the client violated rule 1.9 since he "[*wa*]s representing another client with interests materially adverse to Shai and USA Satellite & Cable: himself"), *aff'd on other grounds*, 932 F.3d 558, 564 (7th Cir. 2019) ("[W]e need not decide whether Mac Naughton violated RPC 1.9(a)."); *Rosenthal Furs, Inc. v. Fine*, 871 S.E.2d 153, 158 n.3, 159–61 (N.C. Ct. App. 2022) (upholding district court's decision to disqualify defendant-attorney from representing himself in an action brought by a former client based on North Carolina's professional conduct rules 1.9 and 3.7). The *Mac Naughton v. Harmelech* court reasoned that "[a]n attorney proceeding *pro se* can use 'confidential factual information' that he obtained in the prior representation against his former clients just as easily as an attorney representing someone else." *Mac Naughton*, 338 F. Supp. 3d at 728 (quoting *Watkins v. Trans Union, LLC*, 869 F.3d 514, 522 (7th Cir. 2017)).

We agree with the *Mac Naughton* court's reasoning and conclude that "another person" as used in rule 32:1.9(a) includes attorneys representing themselves. When read as a cohesive whole rather than as disjointed elements, the rule's focus is on the relationship between two cases in which the same lawyer and client are involved, not the identity of the person on behalf of whom

the lawyer acts in the second matter. "The purpose of the rule is to ensure that a client's confidential communications to his or her lawyer will not be used against that client when the attorney-client relationship has ended and the lawyer later represents a party adverse to the former client," *Hoffmann*, 533 N.W.2d at 836, which, as the *Mac Naughton* court concluded, is just as applicable to an attorney appearing pro se as it is to an attorney representing another party, 338 F. Supp. 3d at 728.

Van Cleaf's argument thus not only ignores the plain text of the rule, *cf. Att'y Doe No. 639*, 748 N.W.2d at 209, but promotes an absurd result by reasoning that the rule is only meant to act as a prophylactic in cases where an attorney might indirectly use confidential information to the detriment of a former client by passing it through a current client, yet has nothing to say about cases where an attorney might directly use confidential information to his own advantage. Although our interpretation may limit a lawyer's ability to pursue personal claims, the right to self-representation has never been absolute. *See Metz v. Amoco Oil Co.*, 581 N.W.2d 597, 599 n.4 (Iowa 1998) (en banc) ("We do not hold the right to appear pro se is unlimited."). Rule 32:1.9(a)'s substantial relationship requirement ensures those limits are no broader than necessary, and any remaining limitations are those that are to be expected when a lawyer takes on the duties of loyalty and confidentiality associated with legal representation. As Professor Sisk noted:

> Perhaps no other element of the attorney–client relationship is as fundamental as the sacred obligation of the lawyer to keep the confidences of his or her client. As attorneys, we serve as agents and advocates seeking to advance the legal objectives of our

> clients, but we also serve as confidants in whom our clients may repose trust. Because our clients are guaranteed confidentiality, they are willing to share their most private thoughts and relate the most sensitive and embarrassing information, *secure in the knowledge that what has been shared will be safeguarded and will never be used against them by the lawyer.*

Gregory C. Sisk, *Change and Continuity in Attorney–Client Confidentiality: The New Iowa Rules of Professional Conduct,* 55 Drake L. Rev. 347, 356 (2007) (emphasis added).

We turn to the application of rule 32:1.9(a) here. Under that rule, an attorney who has represented a client in one action is disqualified from participating in a representative capacity in subsequent litigation against that client "when the subject matter of the new litigation or representation is substantially related to the subject of the prior representation," *Hoffmann,* 533 N.W.2d at 836, and the attorney takes a position "materially adverse" to that of the former client, Iowa R. of Prof'l Conduct 32:1.9(a). Since it is undisputed that van Cleaf's position in this case where he seeks to establish an involuntary guardianship of Mother's child is materially adverse to Mother's interests, our inquiry focuses on the substantial relationship requirement.

Matters are "substantially related if there is 'a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter,' " or if the second matter "involves the same transaction or legal dispute" as the first. *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Stoller,* 879 N.W.2d 199, 216 (Iowa 2016) (quoting Iowa R. of Prof'l Conduct 32:1.9

cmt. [3]). To facilitate the substantial relationship determination, we analyze three factors:

> (1) the nature and scope of the prior representation; (2) the nature of the present lawsuit; and (3) whether the client might have disclosed a confidence to [his or] her attorney in the prior representation which could be relevant to the present action.

*Id.* at 216–17 (alteration in original) (quoting *Doe v. Perry Cmty. Sch. Dist.*, 650 N.W.2d 594, 598 (Iowa 2002)). The party seeking disqualification is not required to show that confidential information will be used in the subsequent litigation, or even that it was disclosed in the prior representation; rather, the rule focuses on the potential for a breach of confidences given the relationship between the two matters. Iowa R. of Prof'l Conduct 32:1.9 cmt. [3] ("Matters are 'substantially related' for purposes of this rule if . . . there . . . is a substantial *risk* that confidential factual information . . . would materially advance the [adverse party's position in the subsequent litigation]." (emphasis added)); *see also Richers v. Marsh & McLennan Grp. Assocs.*, 459 N.W.2d 478, 482 (Iowa 1990) ("Since the issues in the two cases are substantially related, defendants need not show any actual exchange of confidences."); Am. Bar. Ass'n, *Annotated Model Rules of Professional Conduct* § 1.9 (10th ed. 2023) ("Put another way, might the lawyer have learned things in the prior matter that would give the lawyer's client an advantage in the current matter?").

In this case, we agree with the juvenile court that the substantial relationship test was satisfied based on the specific facts as pleaded in the petition. Looking first to the nature and scope of the prior representation: Both van Cleaf and his law partner, Colin McCormack, represented Mother in five

cases between 2013 and 2016, four of which involved child custody disputes between Mother and other parties, and one of which involved a custody dispute over the same child at issue in the current petition, which was resolved in November 2016. At that time, van Cleaf owed fiduciary duties to Mother, not to J.W. Indeed, the court could have appointed a guardian ad litem to advocate for J.W.'s best interests and appointed her an attorney to represent her wishes. *See* Iowa Code § 598.12(1) (2016) ("The court may appoint an attorney to represent the legal interests of the minor child or children of the parties."), (2) ("The court may appoint a guardian ad litem to represent the best interests of the minor child or children of the parties."); *see also id.* § 600B.40 (providing for determination of custody and visitation as part of paternity action using factors from chapter 598). The point is that van Cleaf owed his allegiance to Mother, not to her children.

Turning to the current proceeding: van Cleaf is seeking to gain an involuntary guardianship (i.e., custody) over J.W., over whom McCormack helped Mother establish custody in 2016. This petition requires showing by clear and convincing evidence that there is currently a de facto guardian and that Mother has "demonstrated [a] lack of consistent parental participation in the life of the minor," Iowa Code § 232D.204(1) (2020), or that Mother "is [un]willing or [un]able to exercise the power" of a de facto guardian and the guardianship "is in the best interest of the minor," *id.* § 232D.204(2).[5] Under either path—when

---

[5]The considerations in section 232D.204 overlap with the considerations used in a custody dispute between parents under Iowa Code section 598.41(3). *Compare* Iowa Code

comparing the prior representation to the current litigation under the third substantial relationship factor—we believe there is a substantial risk that Mother disclosed confidences to van Cleaf or McCormack during the prior representation that would be relevant to and materially advance van Cleaf's position in the present action.

In framing the question, we are cautious to not overgeneralize the issues involved in both the prior and current proceedings. *Compare Lyons v. Lyons*, 22 N.Y.S.3d 338, 350–51 (Sup. Ct. 2015) (denying husband's motion to disqualify wife's current attorney in no-fault divorce case, concluding that attorney's previous representation of husband in child support dispute with his prior wife was not substantially related to present divorce case), *with Yeomans v. Gaska*, 58 N.Y.S.3d 754, 756–57 (App. Div. 2017) (affirming disqualification of attorney for mother seeking modification of a child custody order where the attorney represented the father in the original custody matter three years earlier involving the same child, concluding the two proceedings were substantially related "since both pertain to custody and visitation of the child"). Appropriately narrowing the specific issues involved in each proceeding, we conclude that the nature of the prior representation overlaps significantly with the nature of the current litigation—should Mother have custody of her children, specifically J.W.?

---

§ 232D.204(1)(*b*)(2)–(3) (providing that courts may consider, *inter alia*, "[t]he amount of communication and visitation of the parent with the minor during the alleged de facto guardianship"), *with id.* § 598.41(3)(*b*), (*d*) (providing that courts shall consider, *inter alia*, "[w]hether both parents have actively cared for the child"). And, of course, both matters ultimately revolve around the best interests of the child. Notably, section 598.41 is the Code provision van Cleaf would have litigated while representing Mother in the custody disputes with her children's fathers.

We also recognize that the passage of time is relevant to whether a current matter is substantially related to a prior representation. Iowa R. of Prof'l Conduct 32:1.9 cmt. [3] ("Information acquired in a prior representation may have been rendered obsolete by the passage of time, a circumstance that may be relevant in determining whether two representations are substantially related."); *see also Newton v. Stoneridge Apartments*, 424 P.3d 1086, 1092–93 (Utah Ct. App. 2018) ("Ultimately, this case is not about Peterson's domestic past; it is about his criminal behavior a decade later. We therefore conclude that the district court clearly erred when it found the two matters were substantially related."). While the passage of time may make some information provided during a particular representation obsolete, much of the confidential information that can be expected to be disclosed in the context of child custody and parenting matters is likely to be more lasting. *See Yeomans*, 58 N.Y.S.3d at 756 (attorney's prior representation of current client's spouse in custody dispute involving the same child three years prior to the current custody modification proceeding required disqualification of the attorney).

Issues that were relevant in Mother's prior cases (along with any confidential information she disclosed in order to help build her cases) are likely to become relevant again. For example, it is likely van Cleaf became privy to details such as Mother's personal thoughts and feelings about her children and child-rearing generally, including: her religious or moral attitudes towards parenting, if any; her own childhood experiences that might shape her current behavior; and her mental and physical health. In addition, child custody

disputes can be significantly emotional endeavors, such that they uniquely encourage clients to discuss confidential personal details with their attorneys in a way that many other cases do not. Mother is thus more likely to have disclosed confidential information in the prior custody actions than, for instance, if she were simply looking for advice on a standard property transaction. *Cf. NuStar*, 880 N.W.2d at 486 (finding no substantial relationship between a prior consultation about easement contracts and a lawsuit relating to a potential breach of that contract, reasoning that nothing from the consultation meeting in the prior representation "indicates that [the client] disclosed anything in confidence about the agreements to [the attorney] that would affect the current lawsuit").

Although there was a four-year lapse between van Cleaf's representation of Mother and his filing of the instant petition, critical to our analysis is the overlapping time frame between van Cleaf's prior representation and the allegations in his petition. Proving some of the assertions in his petition is likely to involve evidence of Mother's conduct during the time she was a client of his firm. In particular, van Cleaf's petition asserts that Wildt has been serving as a de facto guardian since 2013—the same year van Cleaf and McCormack began representing Mother. Evidence of Wildt's relationship to J.W. and to Mother from that time to the present will necessarily include evidence that Mother was not consistently parenting J.W. while van Cleaf and McCormack were representing her—information that would be very relevant to van Cleaf's involuntary guardianship petition.

Despite van Cleaf's argument that he would not need to use any of Mother's confidential information to advance his current petition, rule 32:1.9(a) does not wait for an actual breach of confidences before disqualification is warranted; the *risk* of such a breach is the proper focus of the disqualification inquiry. *See* Iowa R. of Prof'l Conduct 32:1.9 cmt. [3]. We therefore conclude that the present matter is substantially related to van Cleaf's prior representations of Mother and that, at a minimum, he should have been disqualified from representing himself in this case. *Cf. Rosenthal Furs, Inc.*, 871 S.E.2d at 161 ("[T]he trial court did not abuse its discretion in disqualifying [the attorney] from appearing as an attorney for himself or [for another defendant] on the facts of this case.").

Concluding the proceedings were substantially related, the juvenile court went on to hold that disqualification of van Cleaf under rule 32:1.9(a) required dismissal of the case, reasoning that allowing van Cleaf to proceed if he was "represented by counsel changes nothing" about his breach of duties owed to Mother as a former client. We cannot say the juvenile court abused its discretion in reaching that conclusion. This is not a case where the party seeking dismissal is attempting to misuse our rules of professional conduct to gain a tactical advantage. *See NuStar*, 880 N.W.2d at 482 (cautioning that "the court 'must also be vigilant to thwart any misuse of a motion to disqualify for strategic reasons' " (quoting *Bottoms v. Stapleton*, 706 N.W.2d 411, 415 (Iowa 2005))). Rather, Mother moved to dismiss based on her former attorney's attempt to remove her daughter from her custody and to have himself named as her daughter's

guardian while armed with intimate details about her life and her role as a parent—details he learned through their former attorney–client relationship. Evidence presented at the hearing, including van Cleaf's own testimony, convinced the juvenile court that van Cleaf would be unable to proceed as a petitioner without running afoul of his ethical obligations to Mother. Given the unique circumstances of this case—including the overlap in the timing between van Cleaf's representation of Mother and his and Wildt's involvement in parenting J.W., and the fact that dismissing van Cleaf's petition does not foreclose others (including the state) from filing a petition to advance J.W.'s best interests—dismissal was not clearly untenable.[6] *See, e.g.*, *Quest Diagnostics Inc.*, 734 F.3d at 167 (affirming dismissal of qui tam action based on a violation of New York Rule of Professional Conduct 1.9(c) because, *inter alia*, the petitioner was "not the real party in interest," meaning dismissal did not prevent other parties from bringing a lawsuit or "significantly impair the federal interests embodied in the" act under which the lawsuit was brought); *Mac Naughton*, 338 F. Supp. 3d at 728 (affirming dismissal of action involving attorney's pro se claim against a former client and noting that "[b]ecause Mac Naughton is representing himself, dismissal with prejudice will punish him rather than a possibly innocent client").

---

[6]We also note that it has now been an additional two-and-a-half years since the petition was filed and that circumstances have significantly changed in that time, including, apparently, the court visitor's compliance with the juvenile court's order to investigate the need for a child-in-need-of-assistance (CINA) proceeding.

**IV. Conclusion.**

For the foregoing reasons, the juvenile court order dismissing van Cleaf's petition is affirmed.

**DECISION OF COURT OF APPEALS VACATED; JUVENILE COURT JUDGMENT AFFIRMED.**

Christensen, C.J., and Waterman and McDermott, JJ., join this opinion. Mansfield, J., files an opinion concurring in part and dissenting in part, in which McDonald, J., joins. May, J., takes no part.

**MANSFIELD, Justice (concurring in part and dissenting in part).**

I concur in much of the court's analysis, including its conclusion that attorney Jacob van Cleaf violated Iowa Rule of Professional Conduct 32:1.9(a). I dissent from the court's decision to affirm dismissal.

I agree that the juvenile court had inherent authority over van Cleaf. *See Ronnfeldt v. Shelby Cnty. Chris A. Myrtue Mem'l Hosp.*, 984 N.W.2d 418, 428 (Iowa 2023) ("[S]anctioning parties for wrongful conduct is a natural incident of courts' inherent authority over the *parties* appearing before it . . . .").

But the power should be exercised "with restraint and caution." *Motz v. Motz*, 207 N.W.2d 580, 581 (Iowa 1973). "Dismissal is a drastic remedy." *Toney v. Parker*, 958 N.W.2d 202, 210 (Iowa 2021). "Generally, we do not affirm the sanction of dismissal without the violation of a prior court order." *Id.*

While I agree that van Cleaf could not represent himself in this action, I am not persuaded on this record that it was impossible for the case to go forward. The majority primarily relies on a federal district court case—*Mac Naughton v. Harmelech*, 338 F. Supp. 3d 722 (N.D. Ill. 2018), *aff'd on other grounds*, 932 F.3d 558, 564 (7th Cir. 2019). But that case was dismissed not because the attorney violated the counterpart to rule 32:1.9(a) but because the attorney willfully defied a prior court order. *Id.* at 727–28.

The other authorities cited by the majority are also distinguishable. One involved a qui tam action where the attorney was a relator and not actually a party. *United States v. Quest Diagnostics, Inc.*, 734 F.3d 154, 166 (2d Cir. 2013).

Thus, the violation was of the counterpart to rule 32:1.9(c), not rule 32:1.9(a), *see id.* at 163–64, and no *party* was prevented from pursuing a case, *id.* at 166–67. In another case, a law firm that had represented the husband in a divorce proceeding later represented the wife in an effort to reopen the divorce settlement based on fraud. *Ennis v. Ennis*, 276 N.W.2d 341, 342 (Wis. Ct. App. 1979). The Wisconsin Court of Appeals held that the district court had the power to dismiss the action *if* the law firm refused to withdraw from representing the wife. *Id.* at 347–48. None of these cases provides authority for dismissal in a situation where, as the majority acknowledges, "Van Cleaf's position . . . is not without support." *See also generally* Iowa R. of Prof'l Conduct, pmbl., para. [20] (stating that "violation of a rule does not necessarily warrant any other nondisciplinary remedy" and "does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the rule").

For these reasons, I concur in part and dissent in part.

McDonald, J., joins this concurrence in part and dissent in part.